## McGARRY v. THOMPSON, et al.

No. 7165.   Decided December 30, 1948.   (201 P. 2d 288.)

See 67 C. J., Waters, sec. 407; 56 Am. Jur. 741. Constitutionality of statutes affecting riparian rights, note 56 A. L. R. 277.

*Elias Hansen,* of Salt Lake City, *Grover A. Giles,* Atty. Gen., and *Edward W. Clyde,* Special Asst. Atty. Gen., for appellants.

*Cline, Wilson & Cline,* of Milford, for respondent.

WADE, Justice.

The defendants, the State Engineer and Jerold P. Thompson, appeal from a judgment of the District Court of Iron County which reversed a ruling of the State Engineer's Office approving an application for a change of diversion point and place of use of underground waters pursuant to an application to appropriate such waters. The application to appropriate was filed by M. C. Hintzen in the State Engineer's Office on August 17, 1945. It proposed to ap-

propriate 4 cubic feet per second of underground waters in the Beryl District in Iron County, Utah to irrigate 160 acres of land during the irrigation season and water for domestic and stockraising purposes the year round, it stated that one second foot for 40 acres of land is substantially the correct duty of water in that district and that no more water would be used than was necessary to satisfy the proposed purposes.

At the time of filing this application to appropriate, Hintzen was purchasing 100 acres of land under a contract from plaintiff McGarry. The application to appropriate stated therein that the purpose was to irrigate the 160 acre quarter section of which the 100 acres being purchased was a part and the proposed diversion point was on this 100 acres. The contract expressly stated that in case Hintzen should make application in the State Engineer's Office to appropriate water from wells located on these premises and should thereafter default in his contract with McGarry, that McGarry thereupon would immediately become the assignee and owner of such application to appropriate.

On February 26, 1946, Hintzen had paid in full the purchase price for the 100 acres of land but the title thereto was still in McGarry. By mutual consent the contract to purchase this 100 acres was surrendered and cancelled and McGarry deeded to Hintzen in lieu thereof another 80 acres of land not covered by the contract of purchase. The 80 acres deeded to Hintzen included an application to appropriate waters to irrigate the same. Hintzen, having no use for the application to appropriate which he had filed with the State Engineer's Office covering the 100 acres of land which he had contracted to purchase, executed and delivered a written assignment of such application to McGarry on the above mentioned day. Such assignment was not filed with the State Engineer's Office until December 20, 1946, after it had been recorded on November 23, 1946, in the County Recorder's Office. Hintzen occupied the premises which he contracted to purchase from the time of entering

into that contract to the time he surrendered it back to McGarry, but shortly thereafter and prior to April 1, 1946, he moved from those premises to the 80 acres which was conveyed to him in lieu thereof. Prior to making the assignment of the application to appropriate to McGarry, Hintzen had received a copper identification tag which he was instructed by the State Engineer's Office to place on the well when it was drilled under that application and after he made that assignment he returned this copper tag to the State Engineer's Office and informed it of his changed conditions and that he did not intend to complete that appropriation.

In October, 1945, Thompson became interested in lands and water rights in the Beryl District and he became acquainted with and had considerable dealings with McGarry. He admitted that he had filed four applications to appropriate underground waters in that district for a total quantity of 21.5 cubic feet per second to irrigate 960 acres of land. Thereafter he became interested in acquiring the right to use water to irrigate 160 acres more land and on March 19, 1946 he called on the State Engineer's Office to obtain information on how to acquire such a right. There he examined the records for applications to appropriate underground water in that district under which no well had been drilled and among others he was referred to and examined this Hintzen application. He there learned that Hintzen did not intend to complete this appropriation and took his name hoping to acquire his interest therein. The next day Thompson had a conversation with McGarry and inspected some property with him, and although he knew that McGarry was the owner of the land which the Hintzen application to appropriate was to irrigate, and that Hintzen had surrendered his right to purchase that land and did not intend to make the appropriation, he said nothing to McGarry about his intention to acquire Hintzen's interest in that application to appropriate.

Later Thompson contacted Hintzen. According to Thompson's testimony, Hintzen told him that he still owned the

application to appropriate this water, but that he had returned the copper identification tag to the State Engineer's Office and notified that office that he did not intend to complete his appropriation and expressed doubt that his application was still valid. Thompson by his own testimony was very anxious to obtain the right to develop underground waters to irrigate 160 acres of land in that district and apparently after consulting with the State Engineer's Office he felt that this was about his only chance to obtain such a right, because he testified that he was willing to take a chance and pay Hintzen for this application to appropriate even though he knew that it was of doubtful validity. These circumstances indicate that although the underground waters of this district were not withdrawn from appropriation by the governor's proclamation until April 10, 1946, which was after these negotiations, still the State Engineer's Office was not accepting any new applications to appropriate such waters. Otherwise, Thompson could have filed a new application to appropriate such waters and would not have had to purchase one from someone else. Thompson further testified that Hintzen told him that he still owned 20 acres of the 100 acres which he contracted to purchase from McGarry. However the record shows that Hintzen did not own any interest in that land at that time, and there is nothing to indicate that an examination of the records of the County Recorder's Office would not have revealed the truth on this question.

Prior to April 1, 1946, Thompson agreed with Hintzen to clear the brush from the 80 acres which Hintzen had received from McGarry in exchange for Hintzen's assignment to him of this application to appropriate. There is evidence that such work was worth $10 per acre, and that a part of the work was done by Hintzen himself. There is no doubt that the work done by Thompson for Hintzen was of substantial value. On April 6, 1946, Hintzen executed and delivered to Thompson a written assignment of his application to appropriate this water, on a form fur-

nished by the State Engineer's Office and this assignment was filed in that office for recording on April 16, 1946.

On August 9, 1946, Thompson filed in the State Engineer's Office, an application for a change in the diversion point and the place of use of the waters to be appropriated under the Hintzen application to appropriate. Thereafter and in due time McGarry protested this application to change, claiming to be the owner of the Hintzen application to appropriate. On March 3, 1947, without any formal hearing thereon, the State Engineer approved Thompson's change application. Why no hearing was had does not appear but such method of procedure seems to be out of harmony with proper procedure in deciding such issues. McGarry appealed from that ruling on March 31, 1947 to the District Court and that court, upon the hearing, held that McGarry and not Thompson was the owner of this application.

The record on appeal fails to show that Hintzen's application to appropriate was ever approved. However, the records of the State Engineer's Office shows that it was approved on March 19, 1947, long after both of these assignments had been made and after the State Engineer had approved Thompson's change application. Since the records of the State Engineer's Office are public records, we take judicial notice thereof. Thereafter and after McGarry had taken his appeal to the District Court on May 7, 1947, Thompson commenced and completed drilling his well at a cost of $1975.

Appellants argue at some length that an unapproved application to appropriate water is not assignable and therefore the assignment to McGarry is void. In this argument they seem to assume that this application was approved by the State Engineer after the McGarry assignment and before the Thompson assignment, but they advance no theory which would justify us in reaching such a result. Such being the case, if they are correct in this argument, then

Thompson's assignment as well as that to McGarry, is void and Thompson cannot possibly succeed on this appeal. Therefore a decision of this question is necessary for a determination of this case.

Section 100-3-18, U. C. A. 1943, expressly provides that:

"Prior to issuance of certificate of appropriation, rights claimed under applications for the appropriation of water may be transferred or assigned by instruments in writing. Such instruments, when acknowledged or proved and certified in the manner provided by law for the acknowledgment or proving of conveyances of real estate, may be filed in the office of the state engineer and shall from time of filing of same in said office impart notice to all persons of the contents thereof. * * *"

This provision expressly authorizes the transfer or assignment of rights claimed under an application for the appropriation of water, prior to the issuance of a certificate of appropriation. It makes no distinction between an approved application and one which has not yet been approved. For us to read into that statute such a distinction would be to place a meaning in the statute which there is no evidence that the legislature intended. So, unless this right is so indefinite and lacking in substance that even the legislature could not constitutionally make it assignable, then we must hold it to be assignable.

No vested right to the use of water is acquired by the mere filing of an application to appropriate water. And no such right can be acquired as a result of such filing unless such application be approved either by the State Engineer, or by the court on an appeal therefrom. But the filing of such an application is the initiating step in acquiring such a right without which no such right can be acquired and the priority of any water right later acquired through such initiating step is determined from the date of filing the application and not from the date of appropriation. This is a valuable inchoate right which may mature into a vested right to the use of water. There are many rights which are not presently vested prop-

erty rights which are assignable, such as rights of inheritance, and rights under contract which do not carry with them a presently vested interest in property but which are assignable. In the face of this express statute and in the absence of any constitutional prohibition, we conclude that an application to appropriate unappropriated waters is assignable even though it has not been approved by the State Engineer.

Appellants contend that if McGarry's assignment is held valid he may obtain an approved application to appropriate this water which the State Engineer would not have approved had it been known that it belonged to him. But the legislature made these applications assignable knowing that thereby the rights acquired thereunder might be transferred after the application had been approved, and that the water right which is acquirable thereunder might be used on lands other than those contemplated in the application. Further if the Engineer's approval of this application was based on the assumption that Thompson's assignment is valid, that would not constitute an approval of the application, if it in fact belongs to McGarry. Under such circumstances the Engineer could cancel the approval and require McGarry to show that he is entitled to an approval thereof.

Appellants seem to argue that, if possible, we must sustain the ruling of the State Engineer even though to do so we are required to assume that such ruling was based on the existence of facts and circumstances of which there is no evidence in the record. They argue that probably the engineer found that if the assignment to McGarry was valid he could not approve the application to appropriate because it would be for speculative purposes or that McGarry might not have the ability to complete the appropriation or for some other reason he would be required to deny approval thereof, and for that reason the change application was approved. It might well be that under a valid assignment to McGarry the investigations

of the engineer will disclose facts which will require him to refuse to approve the application to appropriate, but that does not authorize the State Engineer or this court to hold his assignment to be invalid and to give the application to Thompson. If McGarry's assignment is valid and entitled to preference over the assignment of Thompson then neither the State Engineer nor the court can approve Thompson's change application because he does not own the application to appropriate. So we must determine whether Thompson is the owner of the original Hintzen application to appropriate and unless he is, the decision of the trial court must be affirmed.

Appellants contend that since Thompson first filed his assignment for record in the State Engineer's Office he is entitled to a preference over McGarry's assignment. They seem to argue that a filing for record in the State Engineer's Office is a prerequisite to a valid assignment of an application to appropriate unappropriated public waters in this state. But neither the cases nor authorities cited sustain such contention. They merely hold that even under a statute such as this an innocent purchaser for value without notice of a previous conveyance, who first records his conveyance, takes preference over a prior unrecorded conveyance. See *Wells, Fargo & Co.* v. *Smith,* 2 Utah 39, affirmed in *Neslin* v. *Wells,* 104 U. S. 428, 26 L. Ed. 802; Sutherland Statutory Construction, 3rd Ed. by Horack, Vol. 3, page 362, Section 7003. The trial court found that Thompson took his assignment with notice of McGarry's previous assignment and therefore was not a bona fide purchaser for value without notice and therefore he was subsequent in right to McGarry. If we conclude that such finding is supported by a preponderance of the evidence, even though we treat this as a case in equity, then the judgment of the trial court should be sustained. We will therefore examine the record to determine whether that finding is so supported by the evidence.

In *Meagher* v. *Dean*, 97 Utah 173, 91 P. 2d 454, and *O'Reilly* v. *McLean*, 84 Utah 551, 37 P. 2d 770, we quoted with approval from *Wood* v. *Carpenter*, 101 U. S. 135, at page 141, 25 L. Ed. 807, as follows:

> " 'Whatever is notice enough to excite attention and put the party on his guard and call for inquiry is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it.' " [84 Utah 551, 37 P. 2d 775.]

Since the facts and circumstances in this case are unusual in their pattern, we are without the aid of other cases to guide us in applying this rule to the circumstances of this case. When Thompson took his assignment he knew that Hintzen had contracted to purchase 100 acres of land from McGarry, that he made this application to appropriate unappropriated underground waters to irrigate not only that 100 acres but the entire quarter section of which the 100 acres was a part and that the other 60 acres belonged to McGarry and that this application to appropriate was made while that contract was in force and effect. He knew that Hintzen had paid the purchase price of that land then surrendered at least 80 acres of that 100 acres of the land he contracted to purchase to McGarry and had accepted in lieu thereof a conveyance from McGarry of another 80 acre tract with an application to appropriate underground waters to irrigate the same. Inquiry at the County Recorder's Office would have revealed that Hintzen had no interest even in the 20 acres of the land which he contracted to purchase and which Thompson testified that Hintzen claimed to own. Thompson knew that this application to appropriate expressly stated that it was for the purpose of irrigating 160 acres of land; that at least 140 acres of that land belonged to McGarry and Hintzen had no interest therein whatsoever, that the quantity of water to be appropriated was 4 second feet and that it was expressly stated in the application that the duty of water in that district was substantially one second foot to 40 acres of

land. Although he claimed that a second foot of water meant nothing to him, the fact that the application was to irrigate 160 acres of land, that only 20 acres of that land was claimed by Hintzen, and that McGarry owned the rest, should have indicated to him that McGarry was interested in that application.

Appellants argue that the number of second feet stated in the application does not indicate the quantity of water to be appropriated but only indicates the size of the stream which the appropriator intends to divert at a time. But this application expressly states that the duty of water is 1 second foot to 40 acres. The duty of water indicates the quantity of water not the size of the stream. In any event he knew that only a small portion of the land which this application proposed to irrigate belonged to Hintzen and he further, by his own testimony, knew that Hintzen accepted a deed to another 80 acre tract of land and did not intend to appropriate any water under that application but had returned the identification tag to the State Engineer's Office and notified him to that effect. This certainly should have suggested to him that Hintzen had no further interest in that application.

Thompson was well aware of the fact that this land without the possibility of acquiring a water right therefor was of little value. He knew that unappropriated underground waters in that district were getting scarce; on that account he had made a special visit to the State Engineer's Office and thereby learned of this Hintzen application. He testified that he was willing to take a chance in purchasing this application even though he knew of its doubtful validity. These facts and circumstances would naturally suggest that McGarry was vitally interested in this application and that he would not exchange lands with Hintzen and furnish him with an application to irrigate the other lands which he conveyed to Hintzen without securing in return Hintzen's application to appropriate waters to irrigate these lands.

Thompson freely admitted that he was willing to take a chance on purchasing this application from Hintzen even though he knew that it was of doubtful validity. From his testimony it is evident that he is intelligent, knows his business and was capable of investigating and obtaining the information which he desired. He carefully investigated the records in the State Engineer's Office and retained and testified to the facts in that connection which were in his favor. Facts which he considered to his advantage not to know he was quick to claim he did not know. Thus he claimed he did not know what "second feet" means. He testified that Hintzen told him that he was still the owner of this application and of 20 acres of the land which it proposed to irrigate, yet he freely admitted that Hintzen claimed that he had no intention to appropriate water under this application. The only testimony in the record that Hintzen did not fully disclose all of the facts as they then existed is Thompson's uncorroborated testimony; Hintzen being out of the state at the time of the trial was not available as a witness on this question.

All of his dealings in this matter shows that he was willing to take a long chance to obtain this application. He paid Hintzen for the assignment without making any investigation of his ownership of the application except to examine the State Engineer's records; he drilled a well at a cost of $1975 after he knew of McGarry's claim and that he was appealing from the Engineer's ruling. He had business dealings with McGarry and knew that he was interested in this application because he was the owner of all but 20 acres of the land which it proposed to irrigate, and that Hintzen did not intend to develop any water right under that application. These facts certainly should have put him on his guard and called for inquiry. He was dealing with McGarry and the information was readily at hand and yet he closed his eyes thereto. Under these facts and circumstances a prudent business man, which he was, with the ability to investigate, which

he had, would have inquired from McGarry and learned the facts as they existed at that time. These circumstances suggest that he deliberately closed his eyes to the facts which he could have readily learned in the hope that he would thereby obtain an advantage by not knowing them. Under such circumstances he was not an innocent purchaser for value. The judgment of the lower court is affirmed.

Respondent shall recover his costs.

PRATT and LATIMER, JJ., concur.

WOLFE, Justice (dissenting).

I have difficulty in following the reasoning of the prevailing opinion. I shall merely state my reasons for dissenting.

Stripped of non-essential window-trimming, the fundamental skeletal facts of this case are as follows:

On August 17, 1945, Hintzen made application to the office of the state engineer to appropriate 4 c. f. s. of water. On February 26, 1946, Hintzen assigned this application to McGarry by written assignment, and for valuable consideration. Later, on April 6, 1946, Hintzen assigned the same application to appropriate water to Thompson for a valuable consideration, and Thompson filed his assignment for recording in the office of the state engineer. On August 9, 1946, Thompson filed in the office of the state engineer a change application by which he proposed to change the diversion point and place of use from those set forth in the Hintzen application. To this change application McGarry filed his protest, and on March 3, 1947, the state engineer, without any hearing, approved the change application.

The assignment of the application to appropriate from Hintzen to McGarry was not recorded in the State Engineer's office until December 20, 1946, long after Hintzen's subsequent assignment to Thompson. I think the record

is clear that Thompson did not have *actual* knowledge of the prior assignment to McGarry, at the time he took the assignment from Hintzen.

From the order of the state engineer granting Thompson's change application, McGarry appealed to the district court, which reversed the state engineer. From that judgment defendants prosecute this appeal.

The ultimate question in this case is, of course, whether the state engineer erred in granting Thompson's change application. But to determine that question, it is necessary to determine first many preliminary questions.

I agree with the majority that we may take judicial notice that the Hintzen application to appropriate was not approved until March 19, 1947, and that at all times material to the questions involved in this case, the application to appropriate was unapproved. Therefore, we must first consider what rights, if any, vest in the holder of an application to appropriate water while his application to appropriate remains unapproved.

It is elementary, of course, that an application to appropriate does not give any vested right to the use of any waters. Defendants assert that the holder of an unapproved application to appropriate water holds nothing more than a mere possibility or expectancy not coupled with an interest, and hence not assignable. This puts defendants in a somewhat inconsistent position, since Thompson, like McGarry, acquired whatever rights he holds by an assignment. It is difficult to understand how Thompson could acquire any rights by assignment from Hintzen if McGarry could not.

I cannot agree with the contention of defendants that the holder of an unapproved application to appropriate has no assignable rights. It is true that he has no vested rights to the use of water, but he does have an inchoate right of sufficient substance and importance that it may be de-

fended in a court of law. *Robinson* v. *Schoenfeld,* 62 Utah 233, 218 P. 1041; *Tanner* v. *Provo Reservoir Co.,* 78 Utah 158, 2 P. 2d 107.

It must be remembered too, that one of the most important elements of a perfected water right is priority date. Priority date is determined, not by the date appropriation is completed and right of use vests, but on the date when the right to appropriate is initiated, i. e., when application to appropriate is received in the state engineer's office. Section 100-3-18, U. C. A. 1943.

I agree with the majority that the right of a holder of an unapproved application to appropriate is such a right as may be assigned. Countenance is given to this position by the terms of Section 100-3-18, U. C. A. 1943, which provides in part as follows:

"Prior to issuance of certificate of appropriation, rights *claimed* [not vested] under applications for the appropriation of water may be transferred or assigned by instruments in writing." (Italics added.)

The statute says nothing about vested rights to the use of water. It makes no distinction between approved and unapproved applications. It does not say "after approval of an application and prior to issuance of certificate of appropriation, etc." Since the statute does not make any distinctions between approved and unapproved applications, and does not contain any language of limitation, I think it must be construed as applying to all applications to appropriate, whether approved or unapproved. I am therefore of the opinion that rights claimed under an unapproved application to appropriate are assignable.

Having determined that the rights of Hintzen in the unapproved application to appropriate were assignable, the question remains as to which of his two assignees acquired his rights. The general rule is that a person can transfer no greater property interest than he owns. His transferee ordinarily takes subject to the rights of third parties. If

the transferor has no interest, he can transfer no interest, and his transferee acquires no legal interest. There are a few exceptions to this rule, e. g. a thief of money or of a bearer instrument can transfer good title thereto. Ordinarily a bona fide purchaser for value without notice cuts off the equitable interests of third persons.

It is undisputed that McGarry was the prior assignee, and hence he was the one who acquired Hintzen's interest in the application to appropriate. The question then to be determined is whether he could assert his rights as against Thompson in view of his failure to record his own assignment.

Whether McGarry's interest under his assignment from Hintzen be regarded as legal or equitable, it is certain that it could not be cut off by Thompson if he had either actual knowledge of the prior assignment to McGarry, or if he had knowledge of such facts as would have put him on inquiry.

The trial court and the majority here hold that Thompson was on notice of such facts as should have put him on inquiry, and that reasonable inquiry would have revealed to him that Hintzen had previously assigned his application to appropriate to McGarry. With this holding, I cannot agree.

On July 21, 1945, McGarry had contracted to sell 100 acres of land to Hintzen, and by the terms of the contract it was agreed that in case he (Hintzen) should make application to the state engineer to appropriate water from wells located on these premises and should thereafter default on his contract, McGarry would thereupon become the assignee of such application to appropriate. So far as the record shows this contract was never recorded. Thereafter, on August 17, 1945, Hintzen made application to appropriate 4 c. f. s. of water for the purpose of irrigating 160 acres of land including the 100 acres which he had

contracted to purchase from McGarry. That is the application about which this case revolves.

The contract between McGarry and Hintzen was later rescinded by mutual agreement, and Hintzen agreed to accept in lieu of the 100 acres which he had contracted to purchase a different 80 acre tract together with an approved application to appropriate water for the irrigation of the same. On the same day, February 26, 1946, Hintzen executed to McGarry an assignment of his rights under his application of August 17, 1945. That assignment is the basis of McGarry's claim in this action.

On March 19, 1946, Thompson made inquiry at the state engineer's office as to how he might acquire a water right in the vicinity, and he was informed that Hintzen, inter alia, had an application on file which he did not intend to perfect, and which Thompson might be able to purchase.

The following day, Thompson had a conversation with McGarry, but said nothing to him about his plan to purchase Hintzen's application, although he knew that McGarry was then the owner of the lands for which the application to appropriate had been made.

Later Thompson contacted Hintzen, who informed him that he still owned the application to appropriate, but that he had notified the state engineer that he did not intend to complete the appropriation and that he had returned to the state engineer the copper identification band, and that he doubted that his application to appropriate was still valid. Nevertheless, Thompson expressed a desire to acquire whatever interest Hintzen had, and he agreed to perform certain work for Hintzen in return for the assignment of the application. Accordingly, on April 6, 1946, Hintzen executed to Thompson an assignment of his application to appropriate, and as heretofore noted, Thompson filed the same for recording in the state engineer's office on April 16, 1946.

Although Thompson knew that Hintzen's application was of doubtful validity, in view of the fact that he (Hintzen) had indicated to the state engineer that he did not intend to complete his appropriation, I see nothing in the above facts which should have put Thompson on notice that McGarry held or might hold Hintzen's rights under the application. He (Thompson) had been informed by no less an authority than the state engineer that the application stood in Hintzen's name, and Hintzen also so advised him. In the absence of any information to the contrary, this should be sufficient. The only fact pointing to McGarry as a probable assignee of Hintzen's rights is the fact that he then owned the land for which the application to appropriate was made. But in view of Hintzen's statement that he had surrendered his rights thereunder, Thompson would have no reason to believe that such rights were assigned to McGarry. I am of the opinion that the court erred in finding that Thompson was not a bona fide purchaser for value. By the terms of Section 100-3-15, U. C. A. 1943, proceedings to review decisions of the state engineer are governed by the rules of equity practice, and therefore this court may review the facts as well as the law.

The question remaining is to my mind at once the most difficult and the most important question involved in this case, viz. whether McGarry, the prior assignee, may assert his interest against Thompson, the subsequent assignee, who purchased in good faith, without notice and for value. The general rule is that a bona fide purchaser for value cuts off outstanding equities, but he does not defeat prior legal interests. See 3 Pomeroy's Equity Jurisprudence, Sec. 735. A familiar exception to this rule is provided by the express terms of our recording statutes.

Section 78-3-3, U. C. A. 1943, provides as follows:

"Every conveyance of real estate hereafter made, which shall not be recorded as provided in this title, *shall be void* as against any subsequent purchaser in good faith and for a valuable consideration of the same real estate, or any portion thereof, where his own conveyance shall be first duly recorded." (Italics added.)

Section 100-3-18, U. C. A. 1943, provides for written assignment of rights claimed under unapproved applications to appropriate, and further provides that such assignments

"may be filed in the office of the state engineer and shall *from time of filing of same in said office impart notice to all* persons of the contents thereof." (Italics added.)

There is no statute similar to Section 78-3-3, U. C. A. 1943, above quoted, providing that failure to record such assignments shall make such assignments void as against subsequent bona fide purchasers for value.

The defendants, and particularly the defendant state engineer, earnestly urge that although there is no express statutory provision similar to Section 78-3-3, such a provision is necessarily implicit in the terms of Section 100-3-18. In support of this argument, they cite the very early case of *Wells Fargo & Co.* v. *Smith,* 2 Utah 39. It is also earnestly contended that the state engineer cannot intelligently and efficiently perform the duties of his office if he may not rely on his records as to ownership of water rights, applications to appropriate, etc.

Plaintiff, McGarry, asserts with equal force that the case of *Wells Fargo & Co.* v. *Smith,* supra, is not in point, and further that it is a well recognized principle of law that recording statutes are not to be enlarged by implication.

The Wells Fargo case is somewhat similar to the case at bar. In that case the court held, in effect, that as between two mortgages, the junior mortgagee should take precedence, where the senior mortgagee had failed to record his mortgage, and the junior mortgagee took without notice. There, as here, the statute permitted the filing of mortgages for record, but did not provide what the consequences of the failure to record should be. The basis of the prevailing opinion in that case was apparently negligence on the part of the senior mortgagee in failing to record his in-

terest when he had knowledge of a general custom in the community of recording instruments of such nature. I think a sounder basis for the decision would be that the senior mortgagee, by failing to record, had made it possible for the junior mortgagee to be led into believing that the land was free of incumbrances, and therefore he was estopped to assert his interest against the junior mortgagee.

I am of the opinion that when the legislature provides for recording of instruments, and further provides that such recording shall constitute notice, that there is implicit in such statute a provision that the claimant of rights or interests under an instrument coming with the terms of such statute who fails to record such instrument, may not assert his rights against a subsequent innocent purchaser for value. There could be little purpose or value in a recording statute, if the public could not rely thereon. To hold that a prior assignee who had failed to record could assert his interest against a subsequent assignee without notice, would, in effect, emasculate the statute.

The effect of a failure to record under a recording statute is discussed by Pomeroy as follows:

"Although the statutes pronounce unrecorded deeds and mortgages to be void as against subsequent purchasers who have complied with their provisions, yet *in the practical operation of this legislation the right created by a prior unrecorded instrument is generally regarded as tantamount to an equitable interest, which may therefore be cut off by a subsequent purchaser for value* [italics mine] or encumbrancer who is in all respects *bona fide,* and who has also obtained the first record. The total effect of the system is thus twofold; it both enlarges the scope of the doctrine concerning *bona fide* purchaser, *by extending it to all those interests, legal or equitable, which are required or permitted to be recorded* [italics mine] * * *." 3 Pomeroy's Equity Jurisprudence 71, Sec. 758.

In view of the foregoing, I am constrained to hold that McGarry, who failed to record, should not be permitted to assert his interest, against Thompson, an innocent subsequent purchaser; or stated in the more popular but per-

haps less accurate parlance, that Thompson "cut off" the prior interest of McGarry.

I may note here that I am also impressed with the argument of the state engineer that he cannot faithfully and efficiently discharge his duties if he cannot rely upon his own records as to the ownership of unapproved applications. However, that is not the basis for my position. I prefer to rest my dissent upon the reasons heretofore stated.

The prevailing opinion implies that Thompson did not testify as fully and frankly as he might have, that he was evasive, and that his testimony was "tricky". I find nothing in the record to indicate that Thompson testified falsely or evasively. On the contrary, I find his testimony as frank, candid, and fair as that of an interested witness might be expected to be. He freely admitted many things which were against his interest. His testimony is to my mind perfectly plausible, and so far as the record reveals free of taint.

For the reasons above stated, I think the judgment of the trial court should be reversed.

McDONOUGH, C. J., concurs in the views expressed by WOLFE, J.