286 P.2d 773

**SALT LAKE CITY, a municipal corporation of the State of Utah, et al., Plaintiffs and Appellants,**

**v.**

**UTAH LAKE FARMERS ASSOCIATION, an unincorporated association, et al., Defendants and Respondents.**

**No. 8078.**

Supreme Court of Utah.

Aug. 1, 1955.

Ray, Rawlins, Jones & Henderson, Salt Lake City, for appellant.

Clair M. Aldrich, and Christenson & Christenson, Provo, for respondent.

WADE, Justice.

This is an interlocutory appeal to determine unsettled procedural and some substantive problems in a class suit between the Jordan River water users and owners of lands adjoining Utah Lake.

Salt Lake Valley, containing the Great Salt Lake, is abutted on the south by another slightly higher valley, which except for its outlet to the north is completely surrounded by mountain ranges and in the low lands of that valley lies Utah Lake. The waters from the surrounding mountains drain into the lake; the Provo and Spanish Fork rivers from the mountains to the east are the largest contributing streams. The Jordan River, the only outlet of this fresh water lake, courses from the north corner of the lake northward through a narrow neck of land between two mountain ranges called the Jordan Narrows, through which the river has cut a deep narrow channel. Beyond this channel the river flows to the north into the wide Salt Lake Valley and eventually empties into the Great Salt Lake.

Utah Lake covers about 150 square miles, it has three corners, the west shore line meanders back and forth from the north to the south corner and west of that shore line the mountains end somewhat abruptly. On the east side the shore line runs from the north corner toward the southeast, and from the south corner to the northeast, meeting and forming a corner about halfway between the north and south corners of the lake. Around the north, east and south sides of the lake there lies a wide strip of even ground between the lake shores and the mountains which in places slopes very gradually to the water's edge so that a slight rise in the lake water's elevation floods a lot of land. Provo City and many smaller cities and towns occupy this strip, along with many large and small industrial plants, recreation centers and many valuable and intensely cultivated farms.

The elevation of the lake water is each year much higher at the peak of the spring runoff than at its lowest ebb and there is a great fluctuation in the lake water's elevation from year to year. The demand for the use of the Jordan River waters is greater than the supply, which could be greatly increased by obstructing the flow of the river at its highest point as it flows to the north through the deep narrow channel and storing the high runoff waters in the lake and thereby flooding the surrounding lands. From the early settlements there have been disputes between the water users and the landowners and in 1885 Compromise Agreement was entered into to settle such disputes. It established the right of the water users to store water in the lake up to what is known as Compromise Point or Compromise Elevation for which the water users paid the landowners and the Utah Lake and Jordan Dam Commission was created as the

18

agents of both parties to regulate such storage under specified rules. The agreement authorized each side to choose two commissioners and such four commissioners were authorized to choose a disinterested person to be the fifth commissioner. Under this agreement and the clarifying decision of Salt Lake City v. Colladge,[1] two monuments were established to mark the elevation of Compromise Point on the lake shore, one near the head of the Jordan River and the other on Snail Island near the eastern shore line of the lake and north of the mouth of the Provo River and the water users were required to maintain these monuments permanently in their respective positions.

By their complaint the plaintiffs, the water users, and appellants here, allege that both of these monuments have been unavoidably dislocated causing a dispute over the elevation of Compromise Point, that such elevation is 4,515.799 feet above sea level, Salt Lake City, datum, that the defendants other than Provo City will fairly insure the adequate representation of all members of the class of persons interested in this litigation and they pray that the court re-establish the elevation of Compromise Point in accordance with Compromise Agreement and the Colladge decision. The defendants all agree that the monument on Snail Island has been dislocated and that there is a dispute as to the elevation of Compromise Point. Provo City and the other defendants

filed separate answers and counterclaims. Each answer contained several defenses and alleged that Compromise Point was and still is four feet below the top of the monument near the head of the Jordan River, which they allege is "more than six and one-half inches" below 4,515.799 feet above sea level, Salt Lake City, datum. In its counterclaim Provo City claims $200,000 damages from wrongful flooding of its lands, and the other defendants, for themselves and others similarly situated, claim $750,000 damages. The other defendants further allege that until various elements of the rights and liabilities of the parties are determined it is impracticable to plead specific individual claims but that the court should retain jurisdiction to adjudicate such claims in this action after such rights and liabilities are determined. The plaintiffs moved to strike certain paragraphs and defenses and to dismiss the counterclaims. The court denied these motions. Plaintiffs then filed separate replies and defenses to defendants counterclaims, and defendants moved to strike parts of the replies and some of the defenses. Parts of such motions were granted. Whereupon plaintiffs instituted this appeal and defendants cross-appealed.

This case raises the following questions: 1. Do the defendants' counterclaims state claims on which relief can be granted? 2. Did the court err in striking from plaintiffs' reply their third and fourth defenses to the counterclaims? 3. Are the claims

1. 13 Utah 522, 45 P. 891.

alleged in defendants' counterclaims subject to determination and adjudication in this action? 4. How will the judgment in this case affect the rights of persons alleged to belong to the same class as defendants but who are not parties to this action?

1. Each counterclaim states a claim on which relief can be granted. The following is a brief outline of the allegations of the counterclaims: Defendants allege that plaintiffs claim the right to and are storing foreign waters in Utah Lake, consisting of waters brought from other water sheds, waters developed from new reclamation projects, and waters from new wells and that plaintiffs claim the right to and are storing waters to supply new water rights initiated after Compromise Agreement and the Colladge decision. That plaintiffs allowed the monument established on Snail Island to mark compromise elevation to be dislocated and erroneously made the claim that the monument at the head of the Jordan River, on which all other marks of Compromise Point were originally based, had been dislocated and claimed that Compromise Point is "more than six and one-half inches" higher than the elevation originally agreed upon, that accordingly plaintiffs have raised, or induced the water commissioner to raise, other gauge marks which had been used to mark Compromise Elevation and have induced the water commissioner to assume in regulating the height of the water of Utah Lake that such raised marks indicate Compromise Elevation. That in past years and up to August 22, 1952, plaintiffs have maintained obstructions in their Jordan River dam without the openings required by Compromise Agreement even when the water was far above Compromise Point and at a time when there was and it was anticipated that there would continue to be unprecedented runoff of water into the Lake, and that plaintiffs have adopted the natural channel of the Jordan River as their private channel to carry their irrigation waters but have failed to keep it free from obstructions and landslides. They further allege that these claims, conditions and events have been and are contrary to the terms of, and what was contemplated by the makers of Compromise Agreement and have caused the waters of Utah Lake to be raised and held much higher than was authorized under that agreement and the Colladge decision, thereby causing defendants great and irreparable damage. They pray for damages, a determination of their rights and for injunctive relief.

Plaintiffs contend that if the terms and provisions of Compromise Agreement and the Colladge decision have been violated as alleged in the counterclaims they are not responsible nor liable therefor because they do not have control of the amount of water stored in the Lake nor of the amount of water allowed to flow past the Jordan River dam and through its channel. They contend that Compromise Agreement and the Colladge decision establish that the Utah Lake and Jordan Dam Commission act as the agent of both sides of this controversy in

regulating the storage of water in the Lake and that the water commissioner appointed by the State Engineer is by law required to regulate the amount of water allowed to flow through the Jordan River dam and channel.[2] They further contend that the records of this court and the district court, of which we should take judicial notice, show that the changes made in the river bed at the dam and through its channel were made under court supervision. Those records further show that the defendants were not parties to, nor were their rights adjudicated in the actions under which such supervision was exercised. Plaintiffs also contend that we should take judicial notice that the channel of the Jordan River has been lowered since Compromise Agreement was made and that the lake water has been further lowered by pumping large quantities of water out of it from below its outlet through the Jordan River dam and channel thus providing additional storage space in the lake. They point out that the State Engineer's records, which were received in evidence[3] show that from June, 1924, to February, 1952, more than twenty-seven years, the lake water never attained the height of Compromise Point and call attention to the fact that the spring runoff of 1952 was unusually large and much ground was inundated and flooded not only around the shores of Utah Lake but in Salt Lake City and County and to the north along the Weber River.

Plaintiffs contend that the foregoing facts are before us for this decision, either as a part of the records and pleadings or by judicial notice, and that they negative many of the allegations of defendants' counterclaims and show that defendants are not entitled to any relief against plaintiffs under such counterclaims. Assuming, without deciding, that for the purpose of this decision all of these facts exist, such facts do not nullify or conflict with the allegations of defendants' counterclaims nor show that they are not entitled to the relief sought. The counterclaims allege: (1) that plaintiffs have claimed and still erroneously claim that Compromise Point is more than six and one-half inches higher than it in fact is and have thereby induced the water commissioner and the Utah Lake and Jordan Dam Commission to assume that such erroneous claim is correct and to use such erroneous elevation as Compromise Elevation in regulating the flow of the water out of the lake; (2) that large quantities of water have been and are now being stored in the lake contrary to what was contemplated in Compromise Agreement; (3) that plaintiffs have adopted the Jordan River channel as their own private water channel but have failed to keep it free from landslides and cave-ins thereby depriving such

2. See Minersville Reservoir & Irr. Co. v. Rocky Ford Irr. Co., 90 Utah 283, 61 P.2d 605; Caldwell v. Erickson, 61 Utah 265, 213 P. 182; McGarry v. Thompson, 114 Utah 442, 201 P.2d 288.

3. McGarry v. Thompson, supra.

channel of the openings required by Compromise Agreement; and (4) that each and all of the foregoing events have caused the lake water to raise far above Compromise Elevation and far above the height permitted under Compromise Agreement. If we assume, as we must at this stage, that these allegations are true, defendants are entitled to relief and the fact that the water commissioner and the Utah Lake and Jordan Dam Commission have been misled by plaintiffs' erroneous claim, and have misconstrued the contract as to the storage of foreign waters does not relieve plaintiffs from such liability.

■ 2. The court erred in striking plaintiffs' third and fourth defenses. These defenses are based on estoppel, acquiescence and laches. Plaintiffs allege that the claims, conditions and events of which defendants complain have been made, existed and re-occurred constantly since between 1885 and 1914, with the full knowledge, approval, acquiescence of and without objection by the defendants. The allegations are sufficient to permit proof which would establish these defenses, which is the test applied in determining their sufficiency.[4] We are now concerned only with the sufficiency of the allegations, until the proof is offered we cannot determine the sufficiency of the proof.

■ 3. The claims alleged in defendants' counterclaims may be determined in this action. Plaintiffs' complaint seeks only to determine the height of Compromise Point.[5] Defendants seek the same thing claiming that elevation to be more than six and a half inches lower than plaintiffs claim it is, they also seek the adjudication of other rights, injunctive relief and damages. Since the amount of damages, the extent of the other rights and of the injunctive relief are dependent on the height of Compromise Point, until that question is determined the other questions cannot be adjudicated. Plaintiffs contend that the rights of all the parties to that agreement are fixed, limited, dependent and contingent upon the determination of that question and therefore the counterclaims are premature, citing cases.[6] From the fact that defendants' claims cannot be adjudicated until the height of Compromise Point has been determined it does not necessarily follow that such claims are premature. It is only where the adjudication of a fact, not the existence of such fact, is a necessary element of a valid claim that such claim is premature until such adjudica-

4. See Barron & Holtzoff's Vol. 1, Federal Practice & Procedure, sec. 356, at pages 643 to 645, Moore's Federal Practice, 2nd Ed. Vol. 2, 12.08, pp. 2244 and 5.

5. Concededly Rule 13 of the U.R.C.P. greatly enlarges the rights to litigate counterclaims. See White v. District Court, Utah, 232 P.2d 785, where we allowed a counterclaim for damages under such rule to be litigated in an action for unlawful detainer.

6. See Bach v. Quigan, D.C., 5 F.R.D. 34; Fort Chartres, etc., v. Thompson, D.C., 4 F.R.D. 369; Fidelity & Casualty Co. v. Coffelt, D.C., 11 F.R.D. 443; Barron & Holtzoff, Vol. 1, sec. 356, pages 643-644.

tion. Where all that is necessary is the existence of an unadjudicated fact such fact may be determined as a determining factor in the adjudication of the claim. Such is the holding of the authorities cited by plaintiffs.

In 1 Barron & Holtzoff's Federal Practice and Procedure, 791, sec. 393, it is said:

"* * * Thus a claim for damages growing out of the institution of the action or dependent or contingent on its outcome is not a proper counterclaim. Consequently a claim for damages for the improvident issue of an injunction is premature and will not be entertained in the injunction action. Likewise a claim for malicious abuse of process or malicious prosecution growing out of the action in which the counterclaim is filed is premature and consequently is not an admissible counterclaim. * * *"

In Bach v. Quigan, D.C.N.Y.1945, 5 F.R.D. 34, on page 36 the court said:

"This Court is in complete accord with the statement of defendant that the new Rules of Civil Procedure have displaced any 'archaic, obsolete and confining rules' which may previously have governed federal procedure and that they are designed for the swift and just disposition of legal disputes. However, it was never contemplated that any set of facts which might eventually constitute a 'claim upon which relief can be granted' should be interposed as a counterclaim to an action and it would

not be an aid to the swift and just disposition of the matter to permit the issues to be confused by an uncertain claim, the substance of which is contingent upon the outcome of the principal action.

"* * * it is doubtful whether the alleged wrongful motive in instituting the action against defendant Quigan gives rise to a claim for malicious abuse of process * * * such a claim does not mature and no relief can be granted upon it until the merits of the principal action have been determined. * *"

In Fidelity & Casualty Co. v. Coffelt, D.C., 11 F.R.D. 443, at pages 444 and 445, the court said:

"* * * the relief sought is wholly dependent upon plaintiff's failure to prevail in the case at bar and that the— 'Pleading a claim for damages arising from the wrongful bringing of an action before the full determination thereof is premature and unauthorized by the Rules of Civil Procedure.' Goodyear Tire & Rubber Co. v. Marbon Corp., D.C., 32 F.Supp. 279, 280.

*  *  *  *  *  *

"If, as defendant contends, his counterclaim is based upon the alleged slander and libel, and, if in the main action here plaintiff will have proved that the allegedly offending statements are true, then there can be no basis for recovery by defendant. It follows that since it will require the termination of

the main suit to ascertain whether a basis exists for the counterclaim, it has no appropriate place here."

■ A pre-adjudication of the height of Compromise Point is not a pre-requisite to the accrual of defendants' rights to recover under their counterclaims. The elevation at which that point is established will affect the amount of damages, if any, which they are entitled to recover and may be determinative of their right to recover but that is not because a pre-adjudication of such elevation is necessary to the accrual of such rights but because the height of such elevation has a bearing on or may be determinative of such questions. Their rights to relief, if any, accrued when and if their rights under such agreement and decision were violated. The question here presented is whether there has been a violation of such rights and not whether there has been an adjudication of the elevation of Compromise Point. The answer to that question depends on whether there has been a violation of the provisions of Compromise Agreement, not on whether there has been a recent adjudication of the elevation of Compromise Point.

4. The next problem is how, will the judgment in this case affect the rights of persons alleged to belong to the same class as defendants. Rule 23, of the Utah Rules of Civil Procedure has the following provisions:

"(a) Representation. If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is

"(1) joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it;

"(2) several, and the object of the action is the adjudication of claims which do or may affect specific property involved in the action; or

"(3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought."

■ The foregoing deals with three different types of actions; the true, the hybrid and the spurious.[7] Each type requires that the persons belonging to the class be so numerous that it is impracticable to join all of them and that the persons, one or more, joined will fairly insure adequate representation of all members of the class.

---

7. See Nunnelly v. First Federal Building & Loan Ass'n, 107 Utah 347, 154 P.2d 620; Id., 107 Utah 379, 159 P.2d 141; Moore's Federal Practice, 2nd Ed. Vol. 3, sec. 23.03, pp. 3418, 19, sec. 23.07, pp. 3425 and 6, sec. 23.08, pp. 3434 to 8, sec. 23.09, pp. 3439 to 41 and sec. 23.10, pp. 3442 to 5; Barron & Holtzoff's Federal Practice and Procedure, Vol. 2, sec. 562, pp. 144 to 157.

The class actions permitted differ in the character of the rights sought to be enforced and they also differ in the effect that the judgment rendered in the action will have upon the members of the class who are not parties to the action. (1) The true representation class action involves the enforcement of a right which is joint, common or secondary, the judgment in such case will affect similarly all members of the class and should be conclusive and binding on all such members the same as if they were parties to the action. (2) The hybrid representation class action involves the enforcement of rights which are several, where the object of the action is the adjudication of claims which affect specific property impounded in the action. It is conclusive on the members of the class not parties to the action only in disposing of such specific property. (3) The spurious representation class action involves the enforcement of rights which are several where there is a common question of law or fact. It is conclusive and binding only on the parties to the action. The real justification for this type of action is its convenience in litigating numerous individual claims in one action. It is really an invitation to all persons similarly situated to join in the action and litigate their several claims but, except to the extent that common claims are litigated, it has no binding effect on the members of the class who are not parties to the action. In such a case intervention should be freely granted.[8]

Applying these rules to the facts here presents a number of problems. We consider first whether defendants sufficiently represent all members of the class of owners of lands on the Lake shore which are subject to the provisions of Compromise Agreement so as to bind all members of such class in determining the elevation of Compromise Point. Plaintiffs seek a declaratory judgment determining such elevation. They allege that the defendants are so situated as to fairly insure the adequate representation of all members of such class, and that the members are so numerous as to make it impracticable to bring them all before the court. Plaintiffs seek a common relief against all members of this class by the determination of the elevation of Compromise Point. There is no serious claim that joining of the defendants will not fairly insure the adequate representation of all members of this class or that the class is not so numerous as to make it impracticable to bring all such members before the court. So the judgment sought by plaintiffs will be binding and conclusive on all members of this class.

8. See note 7 and Moore's Federal Practice, 2nd Ed. Vol. 3, sec. 23.11, pp. 3456 to 3472 and Barron & Holtzoff's Federal Practice and Procedure Vol. 2, sec. 572; each of these texts points out that in the preliminary draft of the Federal Rules, a provision was made stating the effect of judgments on persons who are not parties, but due to the feeling that such matters are substance and not procedure it was omitted.

The next problem deals with the same class as the first but requires the determination of whether a declaratory judgment of defendants' rights claimed in their counter-claims and a determination of whether they are entitled to injunctive relief will be binding on all members of this class. We exclude from consideration under this problem defendants' claims for individual damages. The same principles apply to this problem as to the first and we reach the same result that all members of this class will be bound and concluded by such a judgment.

██ The third problem deals with a different class of persons. Plaintiffs limit their claim for class representation by defendants to those "who have substantially identical interests in the subject matter of this litigation." The subject matter of the litigation initiated by plaintiffs' complaint is limited to the rights of owners of lands subject to and entitled to the benefits of Compromise Agreement. By their counter-claims defendants seek to litigate the rights of owners of lands on the Lake shores which are not affected by Compromise Agreement and whose rights are different from those whose lands are affected by that agreement. Neither plaintiffs nor defendants allege that the defendants or any of them own any land on the Lake shore not subject to Compromise Agreement. Thus they fail to bring themselves within the new class of persons they seek to represent. Rule 23 only authorizes the defendants to represent a class of persons to which they belong so the rights of this new class cannot be litigated in this action.[9]

██ Defendants further allege that the members of this new class are necessary parties for a complete litigation of the rights of the parties to this action. The rights of the new class are separate, distinct and different from the rights claimed by the parties to this action and neither set of rights are dependent upon or material in the determination of the other, nor is there a showing that there is now or ever has been any dispute between plaintiffs and the new class or any member thereof as to their respective rights. So the members of this class are not necessary parties to this action.

██ The last problem raised under this point is whether the individual damage claims of the defendants and members of the first class should be litigated in this action. The individual damage claims of defendants according to their allegations to some extent arise out of the dispute over the elevation of Compromise Point and are clearly proper counterclaims under Rule 13 of U.R.C.P. and may be litigated in this action. The individual damage claims of the members of this class are several and not common claims as are their claims for violation of their rights and for injunctive relief previously considered. They are spurious not true representation claims and

9. See Barron & Holtzoff's Federal Practice & Procedure, Vol. 2, sec. 567, pp. 171 and 2; Moore's Federal Practice, 2d Ed., Vol. 3, sec. 23.07, subds. (1) and (2).

come under subdivision (a) (3) and not (a) (1), of Rule 23 quoted above. These claims are here only because they arise out of a common violation of the common rights of a class of persons to which defendants belong. Such individual damage claims cannot be litigated by representation, they can only be litigated if the claimant is or becomes a party to this action, for such claims are dependent on individual factors not common to all members of the class and the defendants simply do not represent the other members of the class as to such individual claims.[10] As to such claims a representation class action is merely permissive or an invitation to intervene in the action in the interests of cleaning up a litigious situation and preventing a multitude of actions, by litigating many several claims arising out of a common breach of the common rights of the member of a class.

■■■ Defendants ask the court to first litigate the rights and liabilities of the respective parties to this action and then if the court finds the landowners entitled to damages, receive and litigate the individual claims of the landowners for damages from flooding their lands in violation of such previously determined rights. This would necessitate that the court after litigating the rights and liabilities of the respective parties allow each defendant and each member of this class to specifically plead his individual damage claim and litigate all of such claims in this action. This question has not been ruled on by the trial court and is not before us now. It is a matter largely in the discretion of the trial court in the interest of convenience and a just, speedy and inexpensive determination of these claims. The trial court has wide discretion also in determining, in the interest of such objectives, whether to try the issues raised by plaintiffs' complaint and those raised in defendants' counterclaims and the issues of individual damages in one trial or by separate trials.[11]

10. See Nunnelly v. First Federal Building & Loan Ass'n, supra, note 7; also notes 8 and 9 supra, and Moore's Federal Practice, 2d Ed., Vol. 3, sec. 23.10, (3) [1].

11. In Kinsman v. Utah Gas & Coke Co., 53 Utah 10, 177 P. 418, this court recognized the utility of trying in one action many individual damage claims arising out of a breach of common rights, by allowing plaintiffs to amend their complaint setting out individual damage claims instead of praying for injunctive relief, after an award of injunctive relief by the trial court had been reversed on appeal, we also extended an invitation to intervene and claim individual damages to all persons who had suffered similar damages. See also Wasatch Oil Refining Co. v. Wade, 92 Utah 50, 63 P.2d 1070; Barboglio v. Gibson, 61 Utah 314, 213 P. 385; Summers v. Provo Foundry & Machine Co., 53 Utah 320, 178 P. 916. None of these cases involved a situation where, as here, the party ask that the court determine common rights and then allow all members of the class whether parties to the action or not to intervene and specifically plead individual claims for damages. This question is discussed in Moore's Federal Practice, 2d Ed.; Vol. 3, sec. 23.12, pp. 3472 to 3477.

Thus we conclude as follows: (1) The defendants' counterclaims state claims on which relief may be granted. (2) Plaintiffs' third and fourth defenses each state a defense to the counterclaims or some part thereof and the trial court is directed to reinstate such defenses. (3) The defendants' counterclaims are not premature and may properly be litigated in this action. (4) This is a proper class action and defendants other than Provo City are members of and have similar and common rights with all other persons owning lands adjoining or near to the shores of Utah Lake which are subject to and entitled to the benefits of the provisions of Compromise Agreement and the Colladge decision, so as to fairly insure the adequate representation of the common claims of all members of such class and that the court in this action may make an adjudication, which will be binding on all members of this class, fixing and declaring the elevation of Compromise Point and determining and declaring the common rights and liabilities of all such members as claimed in the counterclaim. There is, however, no showing that any of the defendants belong or have rights similar to the other class which the defendants by their counterclaim seek to represent consisting of owners of lands near or adjoining the Lake shores which are not subject to or entitled to the benefits of the provisions of Compromise Agreement so defendants may not represent such class and their rights may not be adjudicated in this action. The individual claims for damages of the members of the first class who are not parties to this action are several and not common claims and can be litigated in this action only if they are allowed to and do intervene and plead such claims. The procedure in this respect is largely a matter of discretion of the trial court.

There are other questions argued but not discussed in this opinion. Some because they have been made moot by our determinations and others we think are obviously without merit in view of our discussion herein. The case is remanded with instructions to proceed in accordance with this opinion. Each side shall bear their own costs.

McDONOUGH, C. J., concurs.

WORTHEN, Justice (concurring and dissenting).

I agree with the majority opinion that the defendants' counterclaims set forth claims upon which relief can be granted. I am also in agreement with the majority opinion in holding that the trial court erred in striking from plaintiffs' reply their third and fourth defenses to the counterclaims. I am further of the opinion that the claims alleged in defendants' counterclaims are subject to determination and adjudication in this action, with limitations.

Unless the limitations hereafter mentioned will be applied in the trial of this case by the district court, I would feel disposed to hold that the counterclaims of defendants may not be determined and adjudicated in this action. The purpose of

our new rules is to secure speedy disposition of litigation. If the counterclaims set up by defendants are to be loaded onto the proceeding for declaratory judgment and dragged through every stage of the hearing, then they cannot fail to delay and hinder the expeditious determination of the main matter presented in this law suit.

Rule 57, U.R.C.P. provides: " * * * The court may order a speedy hearing of an action for a declaratory judgment and may advance it on the calendar." In my opinion this rule contemplates plenary power to get an action seeking a declaratory judgment at issue and tried.

If, as defendants contend, the plaintiffs have elevated gauges, and have, with the connivance of the agents charged with the duty of maintaining the dams at proper elevation, impaired defendants' rights, then defendants will accomplish the end desired by pleading as they have that the elevation marking compromise point is 6½ inches below the elevation contended for by plaintiff, to wit: 4,515.799 feet above sea level. If defendants are privileged to set out the allegations on which they rely, to wit: that if plaintiffs are permitted to maintain the planks to hold back the water to the elevation of 4,515.799 feet, then defendants will suffer irreparable damage, and if the defendants are further privileged to pray that the court fix the elevation of compromise point and award such damages as defendants may be able to show they have sustained; and if the court makes and enters such order or orders as will retain jurisdiction and authorize defendants to amend their pleadings herein after the determination of the main issue, to wit: elevation of compromise point, then defendants' rights will be adequately protected and the case will be disposed of expeditiously. On the other hand, if the trial court is obliged to drag along at all stages of the hearing the question of damages claimed by defendants, and if as suggested in the majority opinion the landowners on Utah Lake, not within the class of the named defendants, are privileged to intervene and plead such claims as they may have, then this case will not likely be disposed of for years.

The purpose of our modern rules is to secure the expeditious disposition of cases pending before a court; not to permit ancillary matters to be presented and disposed of while the main action is delayed.

The defendant Provo City seeks to recover $200,000 damages by its counterclaim, and the other defendants, for themselves and others similarly situated, claim $750,000 damages. The defendants other than Provo City admit that until various elements of the rights and liabilities of the parties are determined, it is impracticable to plead or prove specific individual claims, and these defendants urge that the court should retain jurisdiction to adjudicate such claims in this action after such rights and liabilities are determined.

It is my opinion that the rights of every defendant, if any exist, as well as the extent

of those rights, can be determined only after compromise elevation has been established and the position of the land of each defendant with respect to compromise elevation has been ascertained.

The ultimate fact and the primary fact from which the rights of defendants will flow, and the extent of their recovery, will depend upon the answer to the following question: have defendants' lands been flooded by the plaintiffs in violation of rights granted to plaintiffs under the compromise agreement?

Whether defendants are entitled to injunctive relief cannot be determined until the elevation of compromise point has been ascertained, and then they will be entitled to injunctive relief only if said point is below the elevation at which plaintiffs have flooded defendants' land. All the questions as to damages, injunctive relief, the persons entitled to be compensated, are dependent upon the height of compromise point. Until that question is determined, it will be impossible to adjudicate the other questions. It is my opinion, as contended for by plaintiffs, that the rights of all the parties to that agreement are fixed, limited, dependent and contingent upon the determination of that question, and therefore the determination of the counterclaims is premature until after that determination is made.

The trial court has one main problem to settle, to wit: the elevation of compromise point. After that has been settled the court can, with proper evidence, determine the extent to which the lands of defendants have been submerged, if any, as the basis for damages claimed by defendants in this case. It would be folly to speculate upon damages which the respective defendants claim, to offer proof as to the value of the land and as to the loss of profits until it was fully determined what land, if any, had been inundated in violation of compromise agreement.

If on the other hand the court can proceed to determine the single question as to the elevation of compromise point, permitting plaintiffs to offer their proof, defendants to offer their proof, and determine the exact elevation of compromise level, then the damages, the trespass, the impairment of defendants' rights by plaintiffs' unlawful flooding, if any, can all follow in logical sequence. The trial court should be instructed to proceed and determine that question first, and, in order that defendants' rights may not be lost, should retain jurisdiction of defendants' alleged counterclaims.

I am unable to agree with the holding of the majority opinion that an adjudication of the height of compromise elevation is not a necessary element of defendants' counterclaims. Without going into the niceties of words or the rarification of ideas, it must be conceded that the rights claimed by defendants in their counterclaims cannot be established without determining the height of compromise elevation. If, as contended by plaintiffs, none of defendants' lands above compromise elevation have been submerged and flooded, defendants will be unable to show damage.

Said agreement recited that the parties of the first part (Utah Lake landowners) "have granted, bargained, sold, conveyed and confirmed unto the said parties of the second part and to their and each of their successors and assigns *forever* the right to maintain the dam in the Jordan River known as the 'Jordan Dam'. * * * Also the right *free from interference or liability for damage* to flow the lands of the said parties of the first part or either of them to the extent which ,the dam as above described may cause the same to be flowed by the waters of the said *Jordan River, Utah Lake or otherwise.* Also the right in addition to the foregoing, free from liability for damage, to flow *the lands* of the said parties of the first part, or either of them, to the extent which may be caused by placing obstructions in the waterway in said dam hereinbefore mentioned according to the limitations hereinafter specified for the purpose of *holding back or retaining the waters in Utah Lake at an elevation or height not to exceed three feet and three and one half inches above the points heretofore established and recognized as low watermark in said Lake* when the waters in said lake would otherwise naturally fall below such height or elevation that the water so held back might be saved for use by the said parties of the *second part when needed."* (Emphasis ours.)

The rights of plaintiffs and the obligations of defendants are fixed by compromise agreement.

Until the elevation of compromise point is determined, it will not be known what, if any, land of which defendants has been flooded, in violation of the agreement. Until that fact is determined, no judgment can be awarded such defendants, and then only to the extent warranted after the area flooded, the period of time flooded, the value of the crops lost by the flooding, have been established.

I believe that the following statement made in the majority opinion, if not confused with other statements, furnishes the proper formula for the trial court in the further hearing of this case:

"Since the amount of damages, the extent of the other rights and of the injunctive relief are dependent on the height of compromise point, until that question is determined the other questions cannot be adjudicated."

I am in agreement with the language of the court in Bach v. Quigan, D.C., 5 F.R.D. 34, quoted in the majority opinion as follows:

" 'This Court is in complete accord with the statement of defendant that the new Rules of Civil Procedure have displaced any "archaic, obsolete and confining rules" which may previously have governed federal procedure and that they are designed for the *swift* and *just* disposition of legal disputes. However, it was never contemplated that any set of facts which might eventually constitute a "claim upon which

relief can be granted" should be interposed as a counterclaim to an action and *it would not be an aid to the swift and just disposition of the matter to permit the issues to be confused by an uncertain claim,* the substance of which is contingent upon the outcome of the principal action.' " (Emphasis ours.)

So here the determination of compromise elevation should be swiftly determined and the trial court directed to retain jurisdiction of defendants' counterclaims for determination after the elevation of compromise point has been established.

CROCKETT, Justice.

I concur. I also agree with Justice WORTHEN that the trial court should first proceed to determine the elevation of compromise point and that other issues should be held in abeyance until that is done.

HENRIOD, Justice (concurring and dissenting).

I concur with the main opinion's enumerated conclusions save the third, which holds the counterclaims not premature. I agree with Mr. Justice WORTHEN that such counterclaims are adjudicable only upon determination of the main fact of this suit, —compromise point. If such be the case, then the very authorities cited by Mr. Justice WADE bear out this writer's contention that the counterclaims are not only premature, but are improper in this action, since he quotes approvingly from Barron

& Holtzoff, among other things that " 'a claim for damages growing out of * * * the action * * * *or contingent on its outcome* is not a proper counterclaim.' "

I cannot subscribe to other quoted language that the new rules "are designed for the swift and just disposition of legal disputes," if such quotation be meant to apply to the instant case, since, apparently because of disagreement in the interpretation of such rules, it goes to the publishers enveloped in a four-year cloud of jurisprudential smog.