Duane **FERGUSON**, Appellant,

v.

**STATE** of Alaska, **DEPARTMENT OF CORRECTIONS,** Susan Humphrey–Barnett, Commissioner, Art Schmidt, Superintendent, Palmer Correctional Center, and Buck Rathbun, C.O. III, Disciplinary Chairman, Palmer Correctional Center, Appellees.

No. S–3733.

Supreme Court of Alaska.

Aug. 2, 1991.

---

Duane Ferguson, pro se.

Larry A. McKinstry, Asst. Atty. Gen., and Douglas B. Baily, Atty. Gen., Juneau, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

### FACTUAL AND PROCEDURAL BACKGROUND

The Alaska Department of Corrections has instituted a program of drug testing applicable to all employees and prisoners. Identified individuals may be tested at the discretion of the Department Superintendent or his or her designee for disciplinary or security reasons.[1] In addition, prisoners are subjected to random urine tests using the enzyme multiplied immunoassay technique (EMIT).[2] Provisions have been made

---

1. Refusal to comply with a random test results in disciplinary measures. Standardized procedures have been developed for collecting the sample and ensuring that an adequate chain of custody is established.

2. The EMIT was developed by the Syva Company in 1980. The process is fairly simple. *See Higgs v. Wilson,* 616 F.Supp. 226, 228 (W.D.Ky. 1985), *vacated,* 793 F.2d 1291 (6th Cir.1986).

We rely on *Higgs* in this opinion simply for its description of the workings of the EMIT. For a full description of the process and a discussion of its problems see Note, *Urinalysis Testing in Correctional Facilities,* 67 B.U.L.Rev. 475, 481–85 (1987) (hereinafter *Urinalysis in Prisons* ). Antigens known to bind to the by-products of the metabolism of certain drugs are added to the urine sample. The sample is then scanned to

for retesting of the specimen in the event the first test is positive.[3]

> The specimen will be preserved for independent and subsequent testing at the prisoner's discretion and expense prior to the Disciplinary Hearing. The prisoner shall, at his or her discretion, request independent testing within 48 hours of receiving the Disciplinary Report; and such a request requires a continuance for retesting, if the request is valid in so far as the prisoner's ability to pay for the testing is concerned. The request must be in writing, include verification of how the independent testing, shipping to and from the laboratory and concommitent [sic] costs will be paid by the prisoner, and specify the laboratory to do the testing....

Dept. of Corrections, *Policies and Procedures*, Index # 803.18, VI.G.4.

Appellant Duane Ferguson is an inmate at Palmer Correctional Center, Minimum Facility. On May 24, 1989, Ferguson was subjected to a random urine test using the EMIT and tested positive for marijuana use. Prior to his positive test, he participated in the Alaska Correctional Industries Program (ACI) at the Palmer Meat Packing Plant.[4] Immediately after the positive test, and without a disciplinary hearing, Ferguson was removed from the ACI Program and special housing, and moved back into the prison dormitory.

Ferguson's request for a retest was denied because he did not have adequate funds in his inmate commissary account. He approached the Inmate Council which agreed to assist him in obtaining a retest, and to pay for it if necessary. A member of the council, Lee Smith, discussed Ferguson's situation with the facility's unit manager, Dale Zoerb, and suggested that the cost of the retest be deducted from Ferguson's commissary account when it was credited for ACI work he had already performed. The account was to be credited on June 2, 1989. Zoerb called Buck Rathbun, the disciplinary committee chairman at Palmer Correctional Center, and recommended this approach. Rathbun, however, denied the request. Smith then offered to pay for the test using a portion of the Inmate Council's prisoner welfare fund. When this was denied, Smith offered to personally pay for the retest. This too was denied.

Ferguson appeared before the disciplinary committee and was found guilty of a High–Moderate Infraction. *See* 22 AAC 05.400(c)(7). The finding was based solely on the alleged positive EMIT result.[5] The sanctions included thirty days of lost statu-

---

quantify the reaction between the antigen and the target drug by-products. *Higgs*, 616 F.Supp. at 228. It is fairly inexpensive, quick, easily transportable, does not require extensive training or a laboratory, and can detect drugs in very low concentrations. However, because it employs an immunoassay technique, it is particularly subject to false positive readings. *Id.* at 229. There are many compounds that when metabolized also react with the reagent used to detect marijuana use. Aspirin is one example. *Id.* There are also substances that naturally occur in urine that may cross-react and result in a false positive. *Urinalysis in Prisons, supra* at 483. Surveys show a range in reliability from a high of 95 percent accurate (Syva) to a low of 52 percent false positive rate (U.S. Department of Defense). *Id.* at 484.

An additional concern is that the metabolites of THC, which the EMIT is designed to detect, may be present in urine up to five weeks after marijuana use. Consequently, a positive test does not necessarily indicate present marijuana use. There is also a problem with passive inhalation; because the EMIT can detect very low concentrations, association with someone using marijuana may result in a positive reading even though the person tested has not used the drug. *Id.* at 483–84.

3. A retest using gas chromatography or mass spectrometry substantially reduces the risks of false positives. Because these tests do not employ the same technology as the EMIT, cross-reaction with non-target substances is not a significant problem. *Higgs*, 616 F.Supp. at 229. Syva recommends retests using a different test technique particularly "where a person's rights, privileges, treatment or employment is at stake." *Id.* (quoting a booklet published by Syva entitled *Frequently Asked Questions About Syva and Drug Abuse Testing*).

4. Inmates involved in the program are paid up to $1.25 an hour, are housed in special housing and are bussed each day from the prison to the plant.

5. Ferguson had not been seen using marijuana or found to be in possession of it. There was no other evidence that indicated he used the drug.

tory good time, twenty days of punitive segregation, and forty hours of free labor in the facility kitchen. The loss of good time and the segregation were suspended as long as Ferguson did not commit any other similar infractions. Ferguson was placed on drug monitoring for 180 days. As of the time Ferguson filed suit, he had not been reinstated in the ACI program.

Ferguson filed a civil rights complaint based on 42 U.S.C. § 1983 and AS 22.10.020 seeking declaratory and injunctive relief. He alleged: 1) his liberty interest in participation in the ACI program was abrogated without due process; 2) he was denied the right to challenge the evidence used against him and thus was denied due process; 3) the indigence-based denial of a retest resulted in a denial of equal protection; and 4) the EMIT test is not sufficiently reliable without alternative testing to be used in this manner.

Instead of filing an answer, the state moved to dismiss arguing that the comprehensive prison conditions litigation, *Cleary v. Smith*, No. 3AN–81–5274 Civ. (Alaska Super., filed Aug. 3, 1981) (hereinafter *Cleary*), should be given res judicata effect.[6] Because the state had attached exhibits to its motion to dismiss, the trial court converted it into a motion for summary judgment, and granted Ferguson a Civil Rule 56(f) continuance to pursue discovery. The state never responded to Ferguson's discovery requests.

Ferguson filed a motion that facts be taken as established on September 26, 1989, which was rendered moot by the grant of the state's motion to dismiss. He also filed a motion to allow lay assistance which the court granted with the limitation that the assistant was not permitted to speak to the court. Ferguson subpoenaed two witnesses, correctional officers Sgt. Dale Zoerb and Sgt. Buck Rathbun, to appear at the summary judgment hearing. The initial subpoena, the only subpoena of which Ferguson was aware, specified that

Zoerb and Rathbun were to appear in Judge Hunt's courtroom.

A hearing was held with Ferguson taking part telephonically. Zoerb and Rathbun also participated telephonically from the same room as Ferguson. The court did not allow the witnesses' testimony, but they remained in the room with Ferguson causing him "considerable trouble in presenting his comments to the Court," and making him very nervous because the two men were defendants and "in control of his life." Because of his agitation, Ferguson decided not to continue with oral argument and told the court he would rely on his written arguments.

The court ruled that the first cause of action failed to state a claim upon which relief could be granted, and it and the remaining causes of action were barred by the doctrine of res judicata. The case was dismissed. Ferguson appeals the dismissal, adding claims that the trial court erred in prohibiting his lay assistant from addressing the court and in allowing Zoerb and Rathbun to remain in the room during the telephonic argument on summary judgment.

## DISCUSSION

### I. *The Res Judicata Effect of Cleary*

■ The superior court dismissed Ferguson's complaint as barred by the doctrine of res judicata, based on *Cleary*. Regarding res judicata we have stated,

Under the doctrine of res judicata, a judgment on the merits of the controversy bars subsequent actions between the same parties upon the same claim. The doctrine implements "the generally recognized public policy that there must be some end to litigation and that when one appears in court to present his case, is fully heard, and the contested issue is decided against him, he may not later renew the litigation in another court." It is settled that res judicata precludes relitigation by the same parties, not only of claims raised in the first proceeding, but

---

6. Ferguson submitted discovery requests on July 19, 1989, but the state requested a stay of discovery pending resolution of the motion to dismiss. Ferguson agreed to the stay, with the

condition that responses would be due within thirty days of the action if the court denied the motion to dismiss or granted a continuance to pursue discovery.

also of those relevant claims that could have been raised.

*DeNardo v. State,* 740 P.2d 453, 455 (Alaska) (quoting *Drickersen v. Drickersen,* 546 P.2d 162, 169 (Alaska 1976)) (citations omitted), *appeal dismissed, cert. denied,* 484 U.S. 919, 108 S.Ct. 277, 98 L.Ed.2d 239 (1987).

■ However, there must have been a full and fair opportunity to litigate the issue before res judicata can be applied.

> The rule is that to be given collateral estoppel effect, an issue must have been actually and fully litigated in the first action.... "It requires only two things: first that the issue has been effectively raised in the prior action, either in the pleadings or through development of the evidence argued at trial or on motion; and second, that the losing party has had 'a fair opportunity procedurally, substantively, and evidentially' to contest the issue."

*Murray v. Feight,* 741 P.2d 1148, 1153–54 (Alaska 1987) (quoting *Overseas Motors, Inc. v. Import Motors Ltd.,* 375 F.Supp. 499, 516 (E.D.Mich.1974), *aff'd,* 519 F.2d 119 (6th Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975)).

Ferguson is technically a party in the *Cleary* litigation. Subclass B includes all inmates who will be incarcerated in the future in the state's correctional facilities. This court has held, however, that "[t]he doctrines of res judicata and collateral estoppel are not applicable to a party who has not had the opportunity to litigate a matter." *Austin v. Fulton Ins. Co.,* 498 P.2d 702, 704 n. 7 (Alaska 1972); *see also Drickersen v. Drickersen,* 546 P.2d 162, 170 (Alaska 1976) ("[A] person cannot be bound by a judgment unless he has had reasonable notice of the claim against him and an

opportunity to be heard in opposition to that claim."). We cannot conclude that Ferguson has been fully heard on the issue of the prison's drug testing policies.[7]

Out of concern that it is unfair to preclude a non-named class member from subsequent litigation, many courts modify the traditional res judicata tests when the initial litigation is a class action. *Nathan v. Rowan,* 651 F.2d 1223, 1227 (6th Cir.1981), is typical: "It is well settled that the constitutional requirements of due process and full faith and credit mandate that absent class members are not bound by a judgment in a class action unless the class representative provided adequate and fair representation." Typically courts will only preclude an absent class member *in* subsequent litigation if the class representatives are found to have made a competent attempt to protect the interests of the individual who now seeks to litigate the issue:

> It has generally been held that a collateral attack on a class action judgment by unnamed members of the class is impermissible when the class members were adequately represented. The question of adequate representation can best be resolved by determining whether the interests of those who would attack the judgment were vigorously pursued and protected in the class action by qualified counsel.

*Garcia v. Board of Educ.,* 573 F.2d 676, 679–80 (10th Cir.1978) (citations omitted).[8]

To determine the propriety of the superior court's decision to dismiss Ferguson's case, we must consider whether his interests with regard to drug testing were adequately represented in the *Cleary* litigation. The Department of Corrections' drug testing procedures were evaluated on cross motions for summary judgment and consti-

---

**7.** Ferguson makes the point that "[i]f this doctrine applies to Ferguson, who was not incarcerated when this issue was decided in *Cleary,* then under the State's assertions this doctrine will apply forever between [it] and all persons who are incarcerated in the future, regardless of the advancements in technology."

**8.** *See also Los Angeles Branch NAACP v. Los Angeles Unified School Dist.,* 750 F.2d 731, 741 (9th Cir.1984), *cert. denied,* 474 U.S. 919, 106

S.Ct. 247, 248, 88 L.Ed.2d 256 (1985); *Bowen v. General Motors Corp.,* 685 F.2d 160, 162 (6th Cir.1982); *Kemp v. Birmingham News Co.,* 608 F.2d 1049, 1054 (5th Cir.1979); *Cotton v. Hutto,* 577 F.2d 453, 454 (8th Cir.1978); *Aronoff v. Carraher,* 146 Colo. 223, 361 P.2d 354 (1961); *Salt Lake City v. Utah Lake Farmers Assoc.,* 4 Utah 2d 14, 286 P.2d 773, 779–80 (1955); *Blount v. City of Laramie,* 510 P.2d 294, 297 (Wyo. 1973).

tuted a relatively insignificant aspect of the litigation and negotiations. The order upholding the procedures was entered comparatively early in the process on January 3, 1984. It appears that the *Cleary* plaintiffs did not thoroughly prepare their case regarding the reliability of EMIT; they did not present "any sworn expert opinion or other competent evidence setting forth facts which would be admissible at trial," [9] and they could not contest material issues of fact because they had not designated a urinalysis or drug testing expert.

We conclude that the *Cleary* plaintiffs did not adequately represent Ferguson's interests as to the reliability of the EMIT test; consequently, the provisions in *Cleary* related to drug testing cannot be given res judicata effect. The EMIT continues to be quite controversial nationally, particularly where deprivation of rights is involved.[10] Although concerns as to its reliability were raised in *Cleary*, they were not given the careful consideration they deserve, and it would be unjust to block further consideration now.[11]

## II. *Ferguson's Right to Access to Prison Rehabilitation Programs*

■ Ferguson contends that he has a protected liberty interest in continued participation in the ACI program. In his view, he was denied due process when he was withdrawn from the program based only on the positive EMIT test, without a hearing or an opportunity for a retest. The trial judge dismissed this count as failing to state a claim upon which relief can be granted, saying, "[t]he plaintiff has no interest in his position of prison employment with the state that rises to or receives constitutional protection." As support, three federal cases were cited.[12] These cases establish that the federal constitution does not create a liberty or property interest in prison employment.

■ Under Alaska law, however, prisoners have an enforceable interest in continued participation in rehabilitation programs. The Alaska Constitution specifies that the twin aims of the penal system are protection of the public and reformation. Art. I, § 12. The latter is not a meaningless guarantee; rather, it creates a right to rehabilitation. *Abraham v. State*, 585 P.2d 526 (Alaska 1978). In *Abraham*, we found "one of the objectives of Article I, § 12 ... 'was the rehabilitation of the offender into a noncriminal member of society,'" and expressed the need to "make the constitutional right to reformation a reality and not simply something to which lip service is being paid." *Id.* at 530, 533 (quoting *State*

9. The only supporting documentation plaintiffs attached to their motion for summary judgment were copies of test records and medical journal and newspaper articles, all of which were inadmissible because they were not sworn or certified. The only evidence presented by the *Cleary* defendants regarding the accuracy of EMIT was the sworn affidavit of one expert.

10. *See Urinalysis in Prisons, supra* note 2; *Higgs*, 616 F.Supp. at 230–31.

11. Ferguson also asserts that changes in the law since the drug testing aspect of *Cleary* was decided restrict its res judicata effect. We noted in *State v. Baker*, 393 P.2d 893 (Alaska 1964), that res judicata does not apply "where supervening decisions of [the Supreme Court] or of the state courts so change the legal atmosphere as to render the doctrine inapplicable." *Id.* at 898.

The decision in *Cleary* regarding drug testing was issued over seven years ago on January 3, 1984. In the intervening years, several courts have considered the issues that Ferguson seeks

to litigate with varying results. *See Urinalysis in Prisons, supra* note 2, at 492–94. Because we have ruled that Ferguson was not adequately represented by the *Cleary* plaintiffs, we do not need to decide whether the legal atmosphere has changed so much as to interfere with the application of the doctrine of res judicata.

12. *See Ingram v. Papalia*, 804 F.2d 595, 596–97 (10th Cir.1986) ("The Constitution does not create a property or liberty interest in prison employment. Therefore, any such interest must be created by state law by 'language of an unmistakably mandatory character.'") (citations omitted); *Adams v. James*, 784 F.2d 1077, 1079 (11th Cir.1986) ("[I]nmates do not have an expectation of keeping a certain job.... The due process clause does not 'in and of itself protect a duly convicted prisoner against' a change of status."); *Gibson v. McEvers*, 631 F.2d 95, 98 (7th Cir.1980) ("An inmate's expectation of keeping a certain prison job does not amount to a property or liberty interest entitled to protection under the due process clause.").

*v. Chaney,* 477 P.2d 441 (Alaska 1970)).[13]

■ The prison industries program from which Ferguson was excluded is a rehabilitation program. Participation in ACI is voluntary, requires application and approval, and confers special privileges.

Since prisoners taking part in ACI have a protected interest in the program, their participation cannot be terminated without a measure of due process of law. *See Hewitt v. Helms,* 459 U.S. 460, 469–472, 103 S.Ct. 864, 870–872, 74 L.Ed.2d 675 (1983). Ferguson was withdrawn from the ACI program immediately following the unconfirmed positive EMIT test and without a hearing or the opportunity to have the sample retested. Given the fairly high degree of unreliability of the EMIT test,[14] this is not adequate process. As the manufacturer of the EMIT acknowledges, retests using a different technique should be required "where a person's rights, privileges, treatment or employment is at stake." *See supra* note 3.

### III. *Alleged Errors at the Hearing on Summary Judgment*

■ Ferguson complains that the manner in which the summary judgment hearing was conducted violated his constitutional right to meaningful access to the courts. Specifically, Ferguson contends that the presence of two correctional officers during his telephonic participation in the hearing intimidated him and prevented him from competently arguing his case. The state responds that Ferguson waived this claim by failing to object to the officers' presence during the hearing. Furthermore, it contends that any error made by

the superior court regarding the presence of the officers was harmless. *See* Civil Rule 61. We are persuaded by the state's arguments, and conclude that Ferguson's rights were not violated.

■ Ferguson also asserts that the court erred by not permitting his lay assistant, Lee Smith, to address the court. We adopt the court of appeals' analysis of a similar issue,[15] and find that limiting Smith's participation was not error. Although Ferguson claims that his case would not have been dismissed if Smith had been allowed to participate, the record does not support this result. Thus, it was not an abuse of discretion to limit Smith's assistance.

The superior court's order dismissing this case is VACATED. The matter is REMANDED for further proceedings consistent with this opinion.

---

**13.** The West Virginia Supreme Court has also found a right to rehabilitation created by state statutes and enforceable through the due process clause. *Cooper v. Gwinn,* 171 W.Va. 245, 298 S.E.2d 781, 788–89 (1981).

**14.** *See supra* note 2.

**15.** *See Skuse v. State,* 714 P.2d 368 (Alaska App. 1986). The trial court denied Skuse's request that he be represented by a lay person at trial, but allowed two friends to sit with him at counsel table. The friends were permitted to confer with Skuse, but they could not address the court. The court of appeals first held that the United States Constitution does not establish a

right to assistance by a person other than an attorney. *Id.* at 369. However, it found that it is within the trial court's discretion to permit lay representation, and such representation is not barred by AS 08.08.230 (misdemeanor of unlawful practice of law). *Id.* at 370–71. It went on to hold that "since there is no constitutional right to lay representation, we would not adopt a rule that denial of lay representation constitutes prejudice *per se.* Consequently, absent a showing of prejudice, we will not consider limitations on lay representation an abuse of discretion." *Id.* at 371.