Gus RATHKE, Appellant,

v.

CORRECTIONS CORPORATION OF AMERICA, INC., Frank Luna, Carl Richie, D.H.O. Sgt. Partain, D.H.O. Sgt. Astrada, Security Chief Lopez, Security Chief Valesquez, PharmChem, Inc., Appellees.

No. S–11885.

Supreme Court of Alaska.

Feb. 23, 2007.

Gus Rathke, pro se, Florence, Arizona.

Michael D. Corey, Sandberg, Wuestenfeld & Corey, Anchorage, for the CCA Appellees.

Andrea E. Girolamo–Welp, Lane Powell, LLC, Anchorage, for Appellee PharmChem, Inc.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

After serving thirty days in disciplinary segregation based on a false positive drug test, and filing administrative grievances that went unanswered, a state prisoner sued his jailers and drug testers. The superior court dismissed the prisoner's claims against the private corrections company that housed him under contract with the state, dismissed his claims against the private company's employees, and granted summary judgment to the drug testing company that reported the incorrect drug test results. Because the corrections company's employees are not liable for the breach of a contract between their employer and another party, and because the prisoner is not a third-party beneficiary of the contract between the corrections company and the testing company, we affirm the superior court's resolution of these issues. But because the prisoner has the right to enforce the state's contract with the corrections company and because the superior court did not address all of the prisoner's claims, we vacate the superior court's orders on these issues and remand for further proceedings.

## II. FACTS[1] AND PROCEEDINGS

Gus Rathke is an Alaska inmate held at the Florence Correctional Center, Central Arizona Detention Center (Florence) in Florence, Arizona, which is owned and operated by the Corrections Corporation of America (CCA), a private company housing Alaska inmates under contract with the Alaska Department of Corrections (the state). Before April 2004 Rathke had never failed a prison drug test. That month he was ordered to submit a urine sample. The urinalysis was performed by PharmChem, Inc., which contracted with CCA to perform drug testing on Florence inmates. PharmChem reported that Rathke tested positive for marijuana. PharmChem reached this result using a cutoff of twenty nanograms of THC metabolites (cannabinoids) per milliliter of urine (ng/ml), which is the standard in Arizona. However, the appropriate standard for Alaska inmates is 50 ng/ml. On April 29, 2004 a guard awakened Rathke following Rathke's graveyard shift as a chemical porter and took him to a prison official who notified him that he was "guilty of THC." Rathke protested that in his seventeen years in prison, he had never failed a drug test. Without affording him a hearing, CCA officials sent Rathke to administrative segregation because he was "an immediate threat to the security of the facility."

Once in segregation, Rathke submitted a request for a drug retest, noting that he had never failed a urinalysis and indicating that "[t]here is a mistake somewhere in the process," since the only medication he took on a regular basis was 600 milligrams of ibuprofen three times a day. No retest was performed. Rathke requested that a hearing advocate be appointed and met with the advocate in segregation. Shortly afterwards, a CCA substance abuse counselor informed Rathke that he had been expelled from a substance abuse program. On May 11, 2004, after twelve days in segregation, Rathke appeared before a hearing officer. Rathke's hearing advocate did not show up at the hearing, despite Rathke's previous request. Rathke was found guilty of illegal drug use under 22 AAC

---

1. Because this is an appeal from dismissal for failure to state a claim, we presume the truth of Rathke's factual allegations. *See Kollodge v. State,* 757 P.2d 1024, 1025–26 (Alaska 1988).

05.400(c)(7) [2] and sentenced to thirty days in punitive segregation. After Rathke was sentenced, the hearing officer asked him if he wanted to appeal. Rathke reportedly told the officer that he wanted to appeal "and that he wanted both the original report and to have an independent laboratory retest the specimen." However, the hearing officer told him that PharmChem, which had done the original test, would be doing the retest, that Rathke would have to pay forty-five dollars for the retest, and that an appeal would result in sixty to ninety additional days in segregation while the matter was being reviewed. According to Rathke, this coerced him to forgo his due process right to appeal because he did not want to remain any longer in punitive segregation. Rathke spent thirty days in punitive segregation and lost his institutional job.

After his release from segregation, Rathke filed a grievance with the Florence administration in August 2004, arguing that the wrong standard was used for his drug urinalysis and that he had been deprived of his right to notice and a hearing before punishment. A retest was done on the same urine sample using the Alaska standard; Rathke passed the retest. The Florence institutional standards officer agreed that the first test should have been conducted at 50 ng/ml and recommended that, although Rathke did not appeal the decision to place him in segregation, all records of the discipline should be removed from Rathke's file and destroyed. Despite these recommendations, Rathke never received a response to his grievance.

Acting on his own behalf, Rathke filed a complaint in Anchorage Superior Court in October 2004 against CCA, several CCA employees (including the Florence warden, standards administrator, two disciplinary hearing officers, and two security chiefs), and PharmChem. Rathke argued in his complaint that CCA, the named CCA employees, and PharmChem breached the contracts described above and violated his constitutional rights by applying the incorrect standard to his urinalysis and instituting unwarranted disciplinary measures. Rathke argued that Alaskan inmates incarcerated by CCA are intended third-party beneficiaries of its contracts with the state and PharmChem by virtue of the *Cleary v. Smith* final settlement agreement (*Cleary* FSA),[3] which is incorporated into the contract between CCA and the state. He claimed (1) compensatory damages for lost wages incurred during his thirty days in segregation, and for the ninety-day "work hold" job restriction that prevented him from an earlier re-hire, and (2) punitive damages. Rathke also sought an injunction ordering CCA and PharmChem to stop the erroneous drug testing methods and a declaratory judgment that CCA and PharmChem had breached their contracts and violated his due process rights. Rathke also sought apologies from the defendants to be directed to the parole board, removal of records of the erroneous drug testing and punishment from his institutional files, and reinstatement in the CCA substance abuse program.

In November 2004 CCA and the named CCA employees moved to dismiss Rathke's complaint for failure to state a claim under Alaska Civil Rule 12(b)(6), arguing that Rathke is not a third-party beneficiary of CCA's contracts with the state or PharmChem. Rathke opposed the motion. Superior Court Judge Mark Rindner granted CCA's motion, ruling that prison inmates are not intended third-party beneficiaries of either of the contracts. The superior court also denied Rathke's motion for reconsideration.

In February 2005 PharmChem followed with a motion for judgment on the pleadings, arguing that Rathke is not a third-party ben-

**2.** "High-moderate infractions include the ... possession, use, or introduction of contraband ... which directly threatens the security of the facility, such as excess money or unauthorized drugs." 22 AAC 05.400(c)(7).

**3.** *Cleary v. Smith*, No. 3AN–81–5274, Final Settlement Agreement and Order (Alaska Super., Sept. 21, 1990). The *Cleary* FSA settled a class action by Alaska state prisoners challenging conditions in state prisons. The FSA contains detailed facility and operational requirements; lists rights and opportunities to be afforded inmates, including rehabilitation programs; and lists procedures for classification of prisoners, administrative segregation, other matters of discipline, and grievances.

eficiary of PharmChem's contract with CCA. Rathke did not oppose the motion. The superior court granted the motion in March 2005, treating it as a motion for summary judgment since PharmChem submitted its contract with CCA as an exhibit to its motion. Rathke later stated that he never received PharmChem's motion or the superior court's order granting it. PharmChem's motion contained a certificate that it was mailed to Rathke when the motion was filed. The superior court's order granting summary judgment also showed that it was mailed to Rathke. PharmChem's attorney submitted an affidavit in July 2005 indicating that she had verified Rathke's address. Rathke submitted with his reply brief to this court a "listing of all legal mail [he] received at CCA facility in Florence," showing that he did not receive any mail from either the court or PharmChem's attorney during the relevant period of time.

Rathke appeals the superior court's rulings. He argues that the superior court erred in dismissing his complaint without addressing all of his claims and in ruling that he is not a third-party beneficiary to CCA's contract with the state or CCA's contract with PharmChem. He also argues that the superior court should have given him an opportunity to amend his complaint and to oppose PharmChem's motion for judgment on the pleadings.

## III. STANDARD OF REVIEW

We review *de novo* an order dismissing a complaint for failure to state a claim under Civil Rule 12(b)(6).[4] To survive a Rule 12(b)(6) motion "it is enough that the complaint set forth allegations of fact consis-

tent with and appropriate to some enforceable cause of action."[5] We presume all factual allegations of the complaint to be true and make all reasonable inferences in favor of the non-moving party.[6]

We also use the *de novo* standard to review grants of summary judgment.[7] As with Rule 12(b)(6) dismissals, the non-moving party is entitled to all favorable and reasonable inferences.[8] We will affirm summary judgment where no genuine issues of material fact exist and where the moving party is entitled to judgment as a matter of law.[9] Because contract interpretation raises questions of law, we review *de novo* the superior court's interpretation of the contracts in this case, including the *Cleary* FSA.[10]

## IV. DISCUSSION

### A. Did the Superior Court Err in Dismissing Rathke's Complaint Without Considering His Constitutional Claims?

#### 1. Rathke adequately raised his constitutional claims.

Rathke argues that the superior court should have considered all of his claims before dismissing his complaint.[11] CCA argues that Rathke failed to preserve his constitutional claims against it and its employees since he did not raise the constitutional claims in his opposition to CCA's motion to dismiss.

The pleadings of *pro se* litigants "should be held to less stringent standards

---

4. *Kollodge*, 757 P.2d at 1026 n. 4.

5. *Id.* at 1025–26.

6. *Id.* at 1026.

7. *Midgett v. Cook Inlet Pre–Trial Facility*, 53 P.3d 1105, 1110 (Alaska 2002).

8. *Id.*

9. *Id.*

10. *Smith v. Cleary*, 24 P.3d 1245, 1247 (Alaska 2001) (citing *Hertz v. State, Dep't of Corrs.*, 869 P.2d 154, 154 (Alaska 1994)). *See also Martech*

*Const. Co., Inc. v. Ogden Envtl. Servs., Inc.*, 852 P.2d 1146, 1149 (Alaska 1993) (settlement agreement interpreted in same manner as any contract).

11. We address Rathke's constitutional claims in this section and his other claims in Parts IV.B and IV.C of this opinion. Rathke also argues that the superior court should have advised him to amend his complaint in order to cure any deficiencies. Because we determine that Rathke adequately raised his constitutional claims, we decline to reach this issue.

than those of lawyers."[12] We have held that where the essence of a *pro se* litigant's argument is "easily discerned" from his briefs, the trial court should consider the *pro se* litigant's argument, provided that the applicable law is well established and the opposing party would not be prejudiced by the court's consideration of the issue.[13]

■ Under these standards, Rathke's constitutional arguments are adequately raised. Contrary to CCA's assertion that Rathke did not raise constitutional claims, Rathke's brief in the superior court in opposition to CCA's Rule 12(b)(6) motion argued that CCA's failure to abide by the terms of the *Cleary* FSA "violated Alaska inmate's constitutional rights." In addition, Rathke referred to the "property int[e]rests in the 'Cleary FSA' which entitles the plaintiff, as a member of the *Cleary* class[,] to the benefits and protections accorded under the 'Cleary FSA,'" which he earlier characterized as "constitutional."[14] Finally, neither CCA nor its employees has alleged that they would be prejudiced by our consideration of Rathke's constitutional arguments.

### 2. Rathke raised colorable constitutional claims against CCA and its employees.

■ We have previously affirmed the right of a prison inmate to sue the state and state prison officials for violations of the inmate's constitutional rights. In *Ferguson v. State, Dep't of Corrections*,[15] we held that prison officials violated an inmate's right to due process when they expelled him from a rehabilitation program without a disciplinary hearing and based on a single unconfirmed urinalysis.[16] We held that Alaska prisoners have an enforceable interest in rehabilitation under the Alaska Constitution, article 1, section 12,[17] of which they may not be deprived without due process of law.[18] Additionally, in *Smith v. Cleary*,[19] we affirmed the right of Alaska inmates housed by CCA in Arizona to enforce the *Cleary* FSA.[20] We therefore hold that Rathke is entitled to bring constitutional claims against CCA and its named employees.[21]

### B. Did the Superior Court Err when It Ruled that Rathke Is Not an Intended Third–Party Beneficiary of the Contract Between the State and CCA?

#### 1. Rathke's contract claim against CCA

The superior court ruled that Alaska inmates in Florence may not sue CCA for breach of its contract with the state since the inmates are not intended third-party beneficiaries of the contract. On appeal, Rathke

---

**12.** *Breck v. Ulmer*, 745 P.2d 66, 75 (Alaska 1987). *See also Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Wilkerson v. State, Dep't of Health & Soc. Servs.*, 993 P.2d 1018, 1021–22 (Alaska 1999).

**13.** *Wilkerson*, 993 P.2d at 1022 (due process and equal protection arguments were sufficiently raised in superior court and preserved for appeal when *pro se* litigant argued that "denying his [foster care] license application on the basis of ... dismissed [criminal] charges unfairly and unjustly deprives [him] of his rights").

**14.** Internal quotation marks and emphasis omitted.

**15.** 816 P.2d 134 (Alaska 1991).

**16.** *Id.* at 139–40.

**17.** Article 1, section 12, of the Alaska Constitution provides:

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual pun-

ishments inflicted. Criminal administration shall be based upon the following: the need for protecting the public, community condemnation of the offender, the rights of victims of crimes, restitution from the offender, and *the principle of reformation*.

(Emphasis added.) *See Ferguson*, 816 P.2d at 139.

**18.** 816 P.2d at 139–40.

**19.** 24 P.3d 1245 (Alaska 2001).

**20.** *Id.* at 1250–51.

**21.** We note that in an action against a CCA employee for violation of federal constitutional rights, the employee would not enjoy the qualified immunity accorded state officials to damage suits under 42 U.S.C. § 1983. *Hertz v. State*, 22 P.3d 895, 903 (Alaska App.2001) (citing *Richardson v. McKnight*, 521 U.S. 399, 412, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997)).

argues that he is an intended third-party beneficiary by virtue of the *Cleary* FSA and its incorporation into the state's contract with CCA.

■■■ In determining whether a third party is an intended beneficiary of a contract, we refer to the Restatement (Second) of Contracts.[22] According to § 302:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.[23]

■■■ When applying these provisions, we have declared that the motives of the parties in executing a contract—especially the promisee[24]—are determinative.[25] A court looks to the parties' objective motive or intent, rather than their subjective motives.[26] As a general rule, if the promised performance is rendered directly to the beneficiary, "the intent to benefit the third party will be clearly manifested."[27] For instance, with regard to a promise to pay money, where a contract exists between a debtor and a lender to pay the debtor's debt to a creditor, if the loan contract calls for the lender to pay a sum directly to the creditor, then the creditor is presumed to be the intended beneficiary of the contract, and thus the creditor may enforce that contract against the lender.[28] This general rule also applies in other contexts where the promisor has promised to perform a duty which the promisee owes to the beneficiary. The Restatement provides the following illustration for § 302: "B promises A to furnish support for A's minor child C, whom A is bound by law to support. C is an intended beneficiary under Subsection (1)(a)."

---

**22.** *See, e.g., Kodiak Elec. Ass'n, Inc. v. DeLaval Turbine, Inc.*, 694 P.2d 150, 154 (Alaska 1984).

**23.** Restatement (Second) of Contracts § 302 (1979).

**24.** *State v. Osborne*, 607 P.2d 369, 371 (Alaska 1980) ("Ordinarily, only the promisee's ... motives are relevant.") (citing 4 A. Corbin, Corbin on Contracts § 776 (1951)). *See also* 13 Williston § 37:8 at 71 ("According to the majority rule, there is no requirement of mutual intent, as to the right of enforcement, on the part of the contracting parties; instead, it is the intent or purpose of the promisee who pays for the promise that has been generally considered as governing....").

**25.** *Osborne*, 607 P.2d at 371. In *Osborne*, since a house builder's employee was not an intended third-party beneficiary of a contract between the house builder and the house buyer, the employee could not collect unpaid wages from the buyer. "It does not seem possible that [the house builder] negotiated a contract to build a house so that he could confer a benefit on his employees any more than he intended to benefit building suppliers in Fairbanks." *Id. See also Howell v. Ketchikan Pulp Co.*, 943 P.2d 1205, 1207 (Alaska 1997). In that case, Howell, a pipefitter, was employed by a contractor to repair a boiler on Ketchikan Pulp Company's premises. Howell was injured on the job and attempted to recover from Ketchikan Pulp on the theory that he was a third-party beneficiary of Ketchikan Pulp's contract with

Howell's employer, which included an indemnity clause for liability for injuries to the contractor's employees. In ruling in favor of Ketchikan Pulp, we held that the parties drafted the indemnity clause in order to allocate liability and protect themselves from litigation, not to benefit the contractor's employees. *Id.*

**26.** *See* Restatement (Second) of Contracts § 2 cmt. b (adopting "external or objective standard for interpreting conduct" in order to determine parties' intentions).

**27.** 13 Richard A. Lord, Williston on Contracts § 37:8 at 70 (4th ed.2000). *See also id.* at 68–69 ("[U]nder the Restatement (Second) view, a party may be deemed an 'intended beneficiary' regardless of the actual intentions of the parties, a view consistent with the objective theory of contracts generally, in that it places primary emphasis on the objective, rather than the subjective intention of the parties.").

**28.** *Alaska Cont'l, Inc. v. Trickey*, 933 P.2d 528, 533 (Alaska 1997) (holding that contract to provide borrower with funds to pay his debts did not give creditors right to enforce contract as third-party beneficiaries since rights vest in creditor only when lender promises to make payment directly to creditor; borrower's intervening agency disrupted any relationship between creditor and lender). *See also* 13 Williston § 37:7 at 55.

The state owes legal duties to all Alaska inmates, including those housed like Rathke at the CCA's Florence, Arizona, facility. These duties are detailed in the *Cleary* FSA, which is an enforceable contract between Alaska inmates and the state.[29] In dismissing Rathke's claim, the superior court conceded that the *Cleary* FSA gives certain rights to prisoners, but it denied third-party beneficiary status to the prisoners with regard to the state/CCA contract. The court noted that the *Cleary* FSA duties run only from the state to the inmates, while the duties in the contract between the state and CCA run only between the state and CCA. On this basis, the court concluded that state prisoners are not third-party beneficiaries of the state/CCA contract.

We disagree with the superior court's analysis. First, the *Cleary* settlement is incorporated by reference into the state/CCA contract. Even more, many of its provisions are repeated virtually word for word in the CCA contract. For example, portions of the discipline section of the state/CCA contract, allegedly breached in Rathke's case, are virtually identical to the *Cleary* FSA. The *Cleary* FSA states:

An inmate must be given a copy of any disciplinary report regarding him or her not more than five working days after the alleged infraction, or the date the prisoner is identified as a suspect in the infraction, whichever occurs later, unless the action is likely to jeopardize an ongoing investigation by the Department or a law enforcement agency. If an investigation is likely to be jeopardized, a copy of the report must be given to the inmate upon completion of the investigation.[30]

The state/CCA contract states:

A Prisoner must be given a copy of a disciplinary report not more than five working days after the infraction or the date the Prisoner is identified as a suspect in the infraction, which ever occurs later. If the investigation is likely to jeopardize an ongoing investigation by the Alaska DOC, CADC, or a law enforcement agency, the report must be given to the Prisoner upon completion of the investigation.

Additionally, the *Cleary* FSA states: "An inmate is presumed innocent of an infraction until proven guilty, and the Department has the burden of establishing guilt by a preponderance of evidence. . . . The determination of the inmate's guilt must be based only on evidence presented at the hearing."[31] The state/CCA contract states: "A prisoner is presumed innocent until proven guilty by a preponderance of the evidence presented at the hearing."

Given this identity of provisions between the FSA and the state/CCA contract, we conclude that the prisoners are intended third-party beneficiaries of the portions of the contract which are taken directly from the FSA.[32]

The result of the superior court's order is that, although Rathke may sue the state under the *Cleary* FSA, he may not sue the state or CCA under identical provisions contained in the state/CCA contract. Such an interpretation denies Florence inmates direct redress against the very institution charged with their day-to-day care and discipline. Accordingly, we hold that Florence inmates also have the right to sue CCA for violations of the *Cleary* FSA provisions contained in the CCA's contract with the state.[33]

**29.** *Smith v. Cleary*, 24 P.3d at 1247 n. 3, 1251.

**30.** *Cleary* FSA at 59.

**31.** *Id.* at 63.

**32.** CCA has also promised to indemnify the state for any claims arising from the CCA's performance of the contract:

CADC shall indemnify, save harmless and defend the state, its officers, and its employees from any and all claims or actions for injuries or damages sustained by any person or property arising directly or indirectly as a result of any act or omission of CADC, subcontractor or anyone directly or indirectly employed by them in the performance of this contract, including but not limited to:
A) Any and all claims, including civil rights claims arising from the provisions of this Contract, including but not limited to, any and all claims arising from:
1) Any breach or default on the part of CADC in the performance of the Contract. . . .

**33.** We note that the United States District Court for Alaska has reached the opposite conclusion in a recent case based on Alaska contract law. *Mil-*

### 2. Rathke's contract claim against CCA employees

 We turn next to Rathke's contract claim against the individual CCA employees. In *Jones v. Central Peninsula General Hospital*,[34] we held that "[g]enerally, an employee cannot be held liable for the breach of a contract between the employer and another party."[35] Thus, the superior court correctly dismissed Rathke's contract claim against individual CCA employees.

### C. Did the Superior Court Err in Ruling that Rathke Is Not a Third–Party Beneficiary to the Contract Between CCA and PharmChem?

██ Unlike CCA's contract with the state, its contract with PharmChem does not refer to inmates or prisoners except in its attachments. Indeed, it mentions only their "specimens" to be submitted for testing. Prisoners might be said to benefit from competent drug urinalysis results reported by PharmChem (when those results are negative), but given the fact that the prisoners are not even mentioned in the contract, it is impossible to say that "the circumstances indicate that [CCA or PharmChem] intends to give [the inmates] the benefit of the promised performance."[36] Accordingly, the superior court did not err in granting summary judgment to PharmChem on Rathke's contract claim.[37] PharmChem also argues that Rathke failed to preserve his contract claim against it because: (1) he failed to oppose PharmChem's motion for summary judgment; and (2) he failed to move for reconsideration once he "allegedly learned" of the grant of summary judgment. Because we agree with the superior court's ruling that Rathke is not an intended third-party beneficiary of the contract between CCA and PharmChem, we decline to reach this issue.

---

ler v. Corrs. Corp. of America, 375 F.Supp.2d 889 (D.Alaska 2005) (federal jurisdiction based on diversity of citizenship). To the extent that *Miller* is inconsistent with our analysis of the third-party beneficiary question presented by the *Cleary* settlement and the state's contract with CCA, we disagree with the decision.

**34.** 779 P.2d 783 (Alaska 1989).

**35.** *Id.* at 791.

### V. CONCLUSION

We AFFIRM the superior court's order granting summary judgment to PharmChem on Rathke's contract claim and its order dismissing Rathke's contract claims against CCA's employees. We VACATE the superior court's order granting CCA's motion to dismiss and REMAND this case to the superior court for further proceedings on Rathke's constitutional and contract claims against CCA and his constitutional claims against CCA's named employees.

**36.** RESTATEMENT (SECOND) OF CONTRACTS § 302(1)(b).

**37.** We make no determination as to whether Rathke's complaint can be read to support a claim for negligence against PharmChem (for failure to carry out testing duties as prescribed in the contract). On remand, if Rathke's unresponsiveness to PharmChem's motion for judgment on the pleadings is found by the superior court to be excused, the court may consider this question.